Mark K. Schonfeld
Regional Director (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, New York 10281
(212) 336-1020



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, :<br><br>Plaintiff, :<br><br>:<br>-against- :<br><br>ARAGON CAPITAL MANAGEMENT, LLC, :<br>ARAGON PARTNERS, LP, ZVI ROSENTHAL, :<br>AMIR ROSENTHAL, AYAL ROSENTHAL, :<br>OREN ROSENTHAL, NOGA DELSHAD, :<br>DAVID HEYMAN, HEYMAN & SON :<br>INVESTMENT PARTNERSHIP LP, :<br>YOUNG KIM, and BAHRAM DELSHAD, :<br><br>Defendants, :<br><br>and :<br><br>EFRAT ROSENTHAL and RIVKA ROSENTHAL, :<br><br>Relief Defendants. : | 07 Civ. 919 (KMK)<br><br><br>AMENDED<br>COMPLAINT |

Plaintiff Securities and Exchange Commission (the "Commission"), for its

Amended Complaint against Defendants Aragon Capital Management, LLC ("Aragon

Capital"), Aragon Partners, LP ("Aragon Partners"), Zvi Rosenthal ("Zvi"), Amir

Rosenthal ("Amir"), Ayal Rosenthal ("Ayal"), Oren Rosenthal ("Oren"), Noga Delshad

("Noga"), David Heyman ("Heyman"), Heyman & Son Investment Partnership, LP

("Heyman & Son"), Young Kim ("Kim"), and Bahram Delshad ("Bahram") (collectively, the "Defendants"), and against Efrat Rosenthal ("Efrat") and Rivka Rosenthal ("Rivka") (collectively, the "Relief Defendants"), alleges as follows:

## SUMMARY

1.     This case involves a brazen scheme of serial insider trading orchestrated by a father and his sons which netted them, their friends, and other relatives at least $4 million. From at least 2001 through November 2005 (the "Relevant Period"), the father, Zvi, a former senior manager at Taro Pharmaceutical Industries, Ltd. ("Taro"), systematically stole, on at least 13 occasions, material, nonpublic information from Taro, traded on it in some instances, and provided it, directly or indirectly, to his sons: Amir, an attorney formerly associated with a large law firm, headquartered in New York; Ayal, an accountant formerly associated with PricewaterhouseCoopers ("PwC"); and Oren, an attorney formerly associated with a large law firm, headquartered in Los Angeles, each of whom traded on the information. The scheme grew to include other relatives and friends, with Amir passing along tips about Taro to his wife, Noga; his father-in-law, Bahram; his friend Heyman, who was employed by Ernst & Young ("E&Y"); and Kim, Amir's supervisor at his law firm. Appendix A, attached hereto, illustrates the flow of inside information among the Defendants.

2.     In addition to buying and selling Taro stock, the Defendants used the stolen nonpublic material information to purchase or sell sophisticated options contracts that were designed to capitalize on stock price movements, but which would escape detection more easily than purchasing or selling stock. Through strategic but frequent options trading, the Defendants garnered significant gains or avoided significant losses.

3.     As the scheme progressed, Amir and Noga created a vehicle through which Amir's family could trade on Taro's nonpublic information without detection. In 2003, Amir and Noga created a hedge fund, Aragon Partners, and its investment adviser, Aragon Capital, to pool money from Rosenthal family members to trade in Taro securities. Through Aragon Partners, the Rosenthal Defendants were able to obscure their identities, further distancing themselves from Zvi, the source of their inside information at Taro. At Amir's request, Noga, his fiancée at the time, set up a brokerage account in which he or she could trade. Trading in Noga's account served to avoid association of the trading with Zvi. At various times Amir tipped Noga with material nonpublic information he received from Zvi, and Noga traded Taro securities or agreed that Amir would trade Taro securities in her account.

4.     In its later stages, certain of the Defendants broadened the scheme to include trading on nonpublic information stolen from entities other than Taro. On at least two occasions, Ayal and Heyman misappropriated material, nonpublic information concerning impending mergers (that ultimately never materialized) from their respective employers, PwC and E&Y, and tipped Amir with the information. Amir then traded on the information. Amir also tipped Kim with the information from Ayal and Heyman, and Kim traded on the information.

5.     By this action, the Commission seeks, among other things, an order providing for: permanent injunctive relief against all of the Defendants, the disgorgement of all profits and losses avoided from the unlawful insider trading activity set forth herein, plus prejudgment interest, and civil monetary penalties; and disgorgement of all ill-gotten gains and losses avoided by every Relief Defendant as a result of the insider trading activity set forth herein.

## JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d), for permanent injunctive relief against the Defendants, from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and for civil penalties pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(3). The Commission also brings this action pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1, for civil penalties against the Defendants under the Insider Trading and Securities Fraud Enforcement Act of 1988. In addition, the Commission seeks an order barring Zvi from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), and for such other relief as the Court may deem appropriate.

7.     Venue lies in this Court pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77v(a), and Sections 21(d), 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1, 78aa. Certain of the acts, practices, transactions and courses of business alleged herein occurred within the Southern District of New York, and Amir, Ayal, Noga, Kim and Heyman lived and worked within this District. Several of the communications between and among the Defendants were made from or within this District and several of the trades were placed from the offices of Amir, Kim, Ayal and Heyman within this District.

8.    Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANTS

9.    **Zvi**, age 62, resides in Tenafly, New Jersey. Zvi is married to Rivka and is the father of Amir, Ayal, Oren, and Efrat. Zvi was employed by Taro from 1994 to February 2006. From 1994 to 1997, Zvi worked at Taro Israel as Assistant to the Senior Vice President and Chief Operating Officer of Taro Israel, and supervised production at Taro Israel's Haifa, Israel plant. In 1997, he moved to Taro USA and began coordinating all of Taro's manufacturing worldwide as Taro's Vice President of Materials Management and Logistics. In 1998, the United States Attorney's Office for the Eastern District of New York charged Zvi with making false claims to the United States Department of Defense in violation of 18 U.S.C. § 267 in connection with Zvi's work (prior to joining Taro) as Operations Manager at Isratex, Inc., a company that manufactured military uniforms and clothing under contract with the United States military. On April 14, 2000, Zvi pleaded guilty to a single felony count of false claims in violation of 18 U.S.C. § 267. He was fined $20,000 and sentenced to three years' probation, including six months of home confinement with electronic monitoring, although he was permitted to continue working at Taro. On February 8, 2007 the United States Attorney for the Eastern District of New York ("USAO-EDNY") charged Zvi with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 in connection with his providing material, non-public information to his son Amir, who traded on the information and provided it to others, who also traded. On February 8, 2007, Zvi pled

guilty to felony conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.

During the Relevant Period, Zvi engaged in certain of the transactions referenced herein

through his Ameritrade account and through accounts he maintained abroad, including

accounts at the Israeli Discount Bank in Israel.

10.     **Amir**, age 29, resides in New York, New York. Amir is Zvi's middle

son. Amir graduated from New York University School of Law in 2004, and was

admitted to the New York Bar in 2006. Amir was the managing member of Aragon

Capital, the investment adviser to Aragon Partners, the Rosenthal family hedge fund, and

traded for the benefit of himself and his family in the Aragon Partners' brokerage

account. In September 2004, Amir was hired as an associate in the Structured Finance

group at a large law firm headquartered in New York, New York. During the Relevant

Period, Amir made certain of the transactions referenced herein through two accounts: (i)

his Custodial Account at Brown & Co., an account originally set up for him by his father,

Zvi; and (ii) his Ameritrade account. Amir, in agreement with Noga, may also have

made certain of the transactions referenced herein through her Ameritrade account. On

February 8, 2007 the USAO-EDNY charged Amir with conspiracy to commit securities

fraud in violation of 18 U.S.C. § 371 in connection with his trading while in possession

of material non-public information he received from Zvi and providing material, non-

public information to others, including Heyman, who traded on the information. On

February 8, 2007 Amir pled guilty to felony conspiracy to commit securities fraud in

violation of 18 U.S.C. § 371.

11.     **Ayal**, age 26, resides in New York, New York. Ayal is Zvi's youngest

son. Ayal graduated from Rutgers College with a bachelor's degree in management in

2001, and began working as an Associate at PwC. In 2002, he received a Masters degree

in accounting from the University of Texas (Austin) while working at PwC. Ayal is a licensed Certified Public Accountant. In the spring of 2005, he moved from PwC's Audit Services Group into the Transaction Services Group. As an employee of PwC, Ayal owed contractual, fiduciary and other duties of trust and confidence to PwC. As a CPA, Ayal held a professional duty to maintain the confidentiality of his clients' information. Ayal resigned from PwC on May 4, 2006. During the Relevant Period, Ayal made certain of the trades referenced herein through Ayal's Custodial Account at Brown & Co., and through his Ameritrade account. On February 8, 2007, the USAO-EDNY charged Ayal with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 in connection with his providing material, nonpublic information to Amir concerning a possible merger of two publicly traded companies that Ayal knew about as a result of his work at PwC. On February 8, 2007 Ayal pled guilty to felony conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.

12. **Oren**, age 31, resides in Los Angeles, California. Oren is Zvi's eldest son. Oren graduated from the University of Southern California Law School in 2003 and began working as a litigation associate with the New York office of a large law firm headquartered in Los Angeles, California. He was admitted to the New York Bar in 2004. In December 2005, Oren transferred to the law firm's Los Angeles office, where he worked on general commercial litigation, white collar criminal defense, and internal investigations until he resigned in January 2007. He was admitted to the bar of California in June 2006. During the Relevant Period, Oren made certain of the trades referenced herein through his Custodial Account at Brown & Co. and through his Ameritrade account.

13.     **Noga**, age 29, resides in New York, New York. Noga graduated from Fordham Law School in 2002 and was admitted to the New York bar in 2004. Noga worked as an associate in the Corporate and Securities Department of a large international law firm from September 2002 to May 2005. Noga is currently an in-house attorney for a large auction house. Amir and Noga married in August 2003. During the relevant period, certain trades referenced herein were made though a brokerage account Noga owned at Ameritrade. Prior to each of those trades, Amir tipped Noga with material, nonpublic information about Taro that he had obtained from Zvi. Thereafter, Noga either traded in Taro securities in her account or agreed that Amir should do so.

14.     **Heyman**, age 29, resides in New York, New York. Heyman graduated from Rutgers College in 1999 and immediately began working at E&Y as an entry-level auditor. While working at E&Y, Heyman obtained a Masters in Accounting from the University of Virginia, and became a licensed Certified Public Accountant in 2003. As an employee of E&Y, Heyman owed contractual, fiduciary and other duties of trust and confidence to E&Y. As a CPA, Heyman held a professional duty to maintain the confidentiality of his clients' information. Heyman resigned from E&Y on January 27, 2006. At the time he left, Heyman was a Senior Manager in the On-Call Consulting Group. During the Relevant Period, Heyman made certain of the transactions referenced herein through his Ameritrade account, and through his Heyman & Son account described below. On February 8, 2007 the USAO-EDNY charged Heyman with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 in connection with his trading Taro securities while in possession of material non-public information that he received from Amir; and in connection with his providing material, nonpublic information to Amir concerning a possible merger of two publicly traded companies that

Heyman learned as a result of his work at E&Y. On February 8, 2007 Heyman pled guilty to felony conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.

15.     **Kim**, age 34, resides in Union City, New Jersey. Kim graduated from Cornell University School of Law in 1998 and, in 2000, began working at the New York-based law firm where Amir later worked. He was admitted to the New York Bar in 2000. In 2002, he transferred to the firm's Structured Finance Group. From approximately September 2004 until June 2006, Kim supervised Amir. During the Relevant Period, Kim made certain of the transactions referenced herein through his Ameritrade account. On February 16, 2007, the Court entered a Final Judgment on Consent against Kim, in which Kim was adjudged to have violated various provisions of the securities laws, enjoined from further violations and ordered to pay disgorgement and penalties in connection with his violations.

16.     **Bahram**, age 56, resides in Englewood Cliffs, New Jersey. Bahram, a retired jewelry shop owner, is Noga's father and Amir's father-in-law. During the Relevant Period, Bahram made certain of the trades through his Ameritrade brokerage account.

17.     **Aragon Capital** is a Delaware limited liability company set up in 2003 by Amir and Noga to act as the General Partner of, and investment adviser to, Aragon Partners.

18.     **Aragon Partners** is a Delaware limited partnership set up in 2003 by Amir and Noga as a hedge fund, and the vehicle through which he placed illicit trades using stolen Taro nonpublic information. Amir, Oren, Ayal, Efrat and Rivka each are limited partners in Aragon Partners and each has a 20% ownership stake. Aragon Partners was funded by transfers from each of Zvi's children's Custodial Accounts, and

by separate deposits from each of the limited partners. Amir made many of the illicit trades described below through Aragon Partners' CyberTrader, Inc. account. In all of the trades Amir executed in the Aragon Partners' account, he acted as the managing member of Aragon Capital.

19. **Heyman & Son** is a limited partnership and hedge fund formed by Heyman in 2005 and funded with money from Heyman's family. Heyman is the General Partner and his father is the only limited partner. During the Relevant Period, Heyman made certain of the trades referenced herein through Heyman & Son's Ameritrade brokerage account.

## RELIEF DEFENDANTS

20. **Efrat**, age 24, resides in Tel Aviv, Israel. She is Zvi and Rivka's daughter and is a limited partner in Aragon Partners. Efrat received a distribution of ill-gotten gains from Aragon Partners in approximately May 2005. In addition, during the Relevant Period, Amir made certain of the transactions referenced herein through Efrat's Custodial Account at Brown & Co.

21. **Rivka**, age 60, resides in Tenafly, New Jersey. She is Zvi's wife, the mother of Amir, Oren, Ayal and Efrat, and a limited partner in Aragon Partners. She received a distribution of ill-gotten gains from Aragon Partners in approximately May 2005.

## RELEVANT ENTITY

22. **Taro** is an Israeli corporation with its principal place of business in Yakum, Israel. Taro develops, manufactures, and markets generic prescription and over-the-counter pharmaceutical products, and active pharmaceutical ingredients, primarily in the United States, Canada, and Israel. Taro earns most of its profits from sales in the

United States market. Taro USA is a United States-based, wholly owned subsidiary of Taro operating in Hawthorne, New York. At all times during the Relevant Period, Taro's shares were registered under Section 12(g) of the Securities Exchange Act of 1934 and quoted on the Nasdaq National Market under the symbol TARO. At all times during the Relevant Period, Taro was a foreign private issuer and filed Forms 20-F annually.

## FACTS

23.     Throughout the Relevant Period, the Defendants stole material, nonpublic information and traded on it. The Defendants used information stolen from Zvi's employer, Taro; Ayal's employer, PwC; and Heyman's employer, E&Y.

**A.     The Taro Insider Trading Scheme**

### Zvi's Access to Information at Taro

24.     During the Relevant Period, Zvi was employed at Taro as Vice President of Materials Management and Logistics. In that position, he was responsible for the manufacture and distribution process of all of the products Taro sells, including raw material procurement, inventory management, and production scheduling. To coordinate Taro's production and distribution, and ensure that Taro matched product demand with production and inventory levels, Zvi had access to daily electronic sales and order data for the U.S. market ("Sales Reports"). In 2001, he participated in daily sales data meetings ("Daily Meetings"). Because Zvi had real-time access to Taro's sales data, he had early knowledge of the company's earnings prospects.

25.     Zvi's production and distribution responsibilities also required that he be alerted to the progress of applications Taro had made to the U.S. Food & Drug Administration ("FDA") for approval of new products Taro wished to market. Zvi was a member of Taro's Product Launch Committee ("PLC"). The PLC met weekly to discuss

the status of various FDA approval processes, and coordinated production of new products in the FDA pipeline with Zvi, so that he could coordinate production of batches for the FDA and ultimately ensure rapid initial distribution of the product on the day Taro obtained FDA approval. Zvi also met regularly with Taro's Director of Regulatory Affairs, who would provide Zvi with the company's changing estimates of expected FDA approval for each pending drug or product so that Zvi could begin drug production as approval neared.

26. Zvi's position gave him access to Taro's most significant nonpublic information: financial information, including current sales and earnings projections, and FDA approval of new products. Beginning in 2001, Zvi passed that information on to his sons, and he, they, their friends, and other relatives, traded on it.

### Taro's Trading and Confidentiality Policies

27. Throughout the Relevant Period, Taro's "Statement of Policy Concerning Trading in Securities of the Company" (the "Trading Policy") prohibited Zvi or any member of his family from trading in Taro securities during specific periods before and after public earnings announcements (the "Blackout Period"). Taro's Trading Policy prohibited directors, officers, and employees of Taro (and each of their husbands, wives, parents, and children) from trading Taro securities at any time, except during a ten-day window each quarter beginning the third business day after Taro publicly announced its quarterly financial results, and ending the thirteenth business day following the announcement. Virtually all of the Rosenthal Defendants' trades prior to Taro's earnings announcements violated Taro's Trading Policy.

28. Throughout the Relevant Period, Taro's Disclosure Policy stated that "employees, officers and directors must not discuss confidential, nonpublic information

about [Taro] with anyone outside [Taro]." In its Trading Policy, Taro similarly prohibited directors, officers and employees from "disclosing, or otherwise passing on to anyone any information concerning [Taro] and its plans and prospects of which [the directors, offices and employees became] aware through [their] work or otherwise."

29.     From approximately May 2001 through November 2005, the Defendants engaged in a scheme to profit from trading Taro securities in advance of Taro announcements concerning five FDA approvals of new drugs or products and eight Taro earnings announcements, yielding more than $4 million in illicit profits and avoided losses:

| Date | Announcement | Total Profits/ Losses Avoided |
|---|---|---|
| May 29, 2001 | FDA Approval of CB Cream | $121,335 |
| July 19, 2001 | Earnings Announcement | $231,701 |
| October 18, 2001 | Earnings Announcement | $188,895 |
| November 26, 2002 | FDA approval of Econazole Nitrate Cream 1% | $33,231 |
| February 20, 2003 | Earnings Announcement | $36,477 |
| April 16, 2003 | Earnings Announcement | $20,869 |
| April 29, 2004 | Earnings Announcement | $5,410 |
| July 29, 2004 | Earnings Announcement | $1,774,818 |
| August 20, 2004 | FDA Approval of Loratadine Syrup | $94,029 |
| March 2, 2005 | FDA Approval for Miconazole Nitrate Vaginal Cream, 4% | $340,574 |
| April 14, 2005 | FDA Approval for Ciclopirox Olamine Cream | $292,983 |
| April 26, 2005 | Earnings Announcement | $132,484 |
| November 17, 2005 | Earnings Announcement | $750,922 |
|  | **Total Trading Profits and Losses Avoided** | **$4,023,728** |

30.     Three detailed examples of the Defendants' insider trading in Taro securities are described below.  The remaining announcements are described in chronological order.

### November 17, 2005 Earnings Announcement

31.     At 7:00 a.m. on November 17, 2005, Taro announced its earnings for the third quarter of 2005.  They fell short of market analyst expectations, with Taro reporting third quarter sales of $72.5 million and net income of $2.1 million, or $0.07 per share, 47% lower than the $4.0 million Taro reported during the third quarter of 2004.  This information was material.

32.     A month earlier, on October 10, 2005, Taro responded to inquiries from investors, analysts and reporting agencies by publicly announcing that it would release its quarterly earnings results in early November 2005.  On October 17, Taro's finance department generated the first draft of consolidated third quarter financial results.  On November 8, Taro issued a press release announcing that it would not release third quarter earnings until November 17, 2005.  By virtue of his access to daily Sales Reports, Zvi knew that the company's sales levels were low compared with previous quarters, and understood the impact that would have on Taro's earnings.

33.     During the time preceding Taro's earnings announcement for the third quarter of 2005, Zvi communicated regularly, directly or indirectly, with Amir, Oren, and Ayal, and provided them with the material, nonpublic information he possessed concerning Taro's quarterly results.  Amir then tipped Noga, and she traded Taro securities or agreed to provide Amir access to her account to trade them.  Amir passed the tip to Heyman and Kim, and they each traded Taro securities.  As a result of the information Zvi supplied, Amir, Noga, Oren, Ayal, and Heyman liquidated bullish

14

positions they had previously established in Taro stock or options, and established a

bearish strategy, using the knowledge that the price of Taro stock or options would

decline after release of Taro's weak 2005 third quarter earnings. Defendants made trades

in the following brokerage accounts surrounding the November 17, 2005 earnings

announcement:

| 11/17/2005 Earnings | | | | | |
|---|---|---|---|---|---|
| Defendant | Trade Date | Buy/Sale | Qty[1] | Description | Loss Avoided/Profit |
| **Aragon Partners' Account** | | | | | |
| | 10/7/2005 | S | (50) | Nov 30 Puts | |
| | 10/18/2005 | B | 50 | Nov 30 Puts | |
| | 10/18/2005 | | | Loss avoidance | $ 43,452.55 |
| | 10/7/2005 | S | (100) | Nov 25 Puts | |
| | 10/18/2005 | B | 4 | Nov 25 Puts | |
| | 10/18/2005 | B | 46 | Nov 25 Puts | |
| | 10/18/2005 | B | 36 | Nov 25 Puts | |
| | 10/18/2005 | B | 14 | Nov 25 Puts | |
| | 10/18/2005 | | | Loss avoidance | $ 80,465.20 |
| | 10/24/2005 | B | 100 | Nov 20 Puts | |
| | 10/24/2005 | B | 100 | Nov 20 Puts | |
| | 10/24/2005 | B | 200 | Nov 20 Puts | |
| | 10/31/2005 | B | 100 | Nov 20 Puts | |
| | 11/9/2005 | S | (100) | Nov 20 Puts | |
| | 11/17/2005 | S | (100) | Nov 20 Puts | |
| | 11/17/2005 | S | (100) | Nov 20 Puts | |
| | 11/17/2005 | S | (100) | Nov 20 Puts | |
| | 11/17/2005 | S | (100) | Nov 20 Puts | $ 115,154.38 |
| | 10/24/2005 | S | (80) | Nov 20 Calls | |
| | 10/24/2005 | S | (200) | Nov 20 Calls | |
| | 10/24/2005 | S | (32) | Nov 20 Calls | |
| | 11/18/2005 | Expired | 312 | Nov 20 Calls | $ 56,333.77 |
| | 10/24/2005 | S | (15) | Nov 22.5 Calls | |
| | 10/24/2005 | S | (200) | Nov 22.5 Calls | |
| | 10/26/2005 | S | (200) | Nov 22.5 Calls | |
| | 10/27/2005 | S | (200) | Nov 22.5 Calls | |
| | 11/18/2005 | Expired | 615 | Nov 22.5 Calls | $ 35,397.43 |
| | 10/24/2005 | S | (60) | Dec 20 Calls | |
| | 10/24/2005 | S | (200) | Dec 20 Calls | |
| | 10/24/2005 | S | (76) | Dec 20 Calls | |
| | 10/24/2005 | S | (64) | Dec 20 Calls | |

---

[1]  The quantities in parentheses are sales.

| | | | | | |
|---|---|---|---|---|---|
| | 12/16/2005 | Expired | 400 | Dec 20 Calls | $ 84,336.64 |
| | 10/26/2005 | S | (159) | Jan 22.5 Calls | |
| | 1/20/2006 | Expired | 159 | Jan 22.5 Calls | $ 21,334.90 |
| | 10/26/2005 | S | (46) | Jan 25 Calls | |
| | 1/20/2006 | Expired | 46 | Jan 25 Calls | $ 2,945.42 |
| | | | | **Total Profit Aragon:** | **$ 439,420.29** |
| | | | | | |
| **Noga's Account** | | | | | |
| | 10/7/2005 | S | (50) | Nov 25 Puts | |
| | 10/18/2005 | B | 42 | Nov 25 Puts | |
| | 10/18/2005 | B | 8 | Nov 25 Puts | |
| | 10/18/2005 | | | Loss avoidance | $ 41,209.51 |
| | 10/24/2005 | B | 100 | Nov 20 Puts | |
| | 10/24/2005 | B | 44 | Nov 20 Puts | |
| | 10/24/2005 | B | 56 | Nov 20 Puts | |
| | 11/17/2005 | S | (100) | Nov 20 Puts | |
| | 11/17/2005 | S | (100) | Nov 20 Puts | $ 49,362.49 |
| | | | | **Total Profit Noga:** | **$ 90,572.00** |
| | | | | | |
| **Oren's Account** | | | | | |
| | 9/19/2005 | S | (30) | Jan 22.5 Puts | |
| | 10/21/2005 | B | 5 | Jan 22.5 Puts | |
| | 10/21/2005 | B | 25 | Jan 22.5 Puts | |
| | 10/21/2005 | | | Loss avoidance | $ 17,716.51 |
| | 10/25/2005 | S | (3,200) | TARO shares | |
| | 10/25/2005 | | | Loss avoidance | $ 22,066.16 |
| | 10/31/2005 | S | (20) | Nov 25 Calls | |
| | 11/18/2005 | Expired | 20 | Nov 25 Calls | $ 973.96 |
| | 11/2/2005 | S | (15) | Dec 25 Calls | |
| | 12/16/2005 | Expired | 15 | Dec 25 Calls | $ 1,327.70 |
| | 11/7/2005 | B | 15 | Nov 22.5 Puts | |
| | 11/9/2005 | S | (15) | Nov 22.5 Puts | $ 1,380.40 |
| | | | | **Total Profit Oren:** | **$ 43,464.73** |
| | | | | | |
| **Ayal's Account** | | | | | |
| | 10/10/2005 | S | (15) | Nov 25 Puts | |
| | 10/20/2005 | B | 15 | Nov 25 Puts | |
| | 10/20/2005 | | | Loss avoidance | $ 11,602.76 |
| | 11/7/2005 | B | 100 | Nov 20 Puts | |
| | 11/11/2005 | S | (100) | Nov 20 Puts | $ 4,827.68 |
| | | | | **Total Profit Ayal:** | **$ 16,430.44** |
| | | | | | |
| **Heyman's Account** | | | | | |
| | 5/23/2005 | B | 600 | TARO Stock | |

| | 6/13/2005 | S | (20) | Jul 35 Puts | |
|---|---|---|---|---|---|
| | 6/14/2005 | S | (30) | Jul 35 Puts | |
| | 7/13/2005 | B | 4,200 | TARO stock | |
| | 7/18/2005 | B | 800 | TARO stock | |
| | 10/19/2005 | S | (5,600) | TARO stock | |
| | 10/19/2005 | | | Loss avoidance | $ 47,079.67 |
| | 10/24/2005 | B | 66 | Nov 20 Puts | |
| | 10/24/2005 | B | 15 | Nov 20 Puts | |
| | 10/24/2005 | B | 19 | Nov 20 Puts | |
| | 10/24/2005 | B | 50 | Nov 20 Puts | |
| | 11/7/2005 | B | 100 | Nov 20 Puts | |
| | 11/17/2005 | S | (100) | Nov 20 Puts | $ 27,826.72 |
| | 11/17/2005 | S | (150) | Nov 20 Puts | $ 53,368.46 |
| | | | | **Total Profit Heyman:** | **$ 128,274.85** |
| **Heyman & Son's Account** | | | | | |
| | 6/14/2005 | S | (20) | Jul 35 Puts | |
| | 7/13/2005 | B | 2,000 | TARO stock | |
| | 10/19/2005 | S | (2,000) | TARO stock | |
| | 10/19/2005 | | | Loss Avoidance | $ 16,847.10 |
| | 10/24/2005 | B | 50 | Nov 20 Puts | |
| | 11/17/2005 | S | (50) | Nov 20 Puts | $ 11,902.39 |
| | | | | **Total Profit Heyman & Son:** | **$ 28,749.49** |
| **Young Kim's Account** | | | | | |
| | 11/3/2005 | B | 10 | Nov 20 Puts | |
| | 11/3/2005 | B | 5 | Nov 20 Puts | |
| | 11/17/2005 | S | (15) | Nov 20 Puts | $ 4,010.32 |
| | | | | **Total Profit 11/17/2005 earnings:** | **$ 750,922.12** |

34.     Trading concerning Taro's November 17, 2005 earnings announcement

resulted in more than $750,000 in total profits and losses avoided.

### July 29, 2004 Earnings Announcement

35.     On July 29, 2004 at 7:00 a.m., Taro released its second quarter earnings

results, reporting that the quarter was the worst quarter, from a sales perspective, that

Taro had ever reported. Taro reported a $17.6 million operating loss, compared with

operating profit of $18 million for the second quarter of 2003. Quarterly sales were $49.1 million compared with $74.8 million in the second quarter of 2003 and earnings per share were $0.08, compared with $0.97 for the second quarter of 2003. This information was material.

36. On June 28, 2004, Taro's CFO sent a memorandum to all department heads, requesting an immediate review of all projects, a headcount for the balance of 2004, and proposals to reduce costs by 10%. The same day, Zvi sent an email to Taro Israel employees ordering a reduction in manufacturing to avoid a build-up of inventory.

37. On July 6, 2004, Zvi received an email from Taro's Finance Department explaining that Taro had to start making plans to dramatically reduce inventory levels immediately because inventory growth was dramatically affecting Taro's cash flow.

38. By virtue of his position, Zvi had access to material, nonpublic information, including daily Sales Reports, between February and June 2004 that showed the dismal quarter Taro was experiencing. On June 16, 2004, Zvi attended a Sales & Operations meeting to discuss the quarter's actual sales and its negative performance relative to the sales forecast. On June 23, Zvi attended a Sales & Operations meeting where the sales outlook for the quarter was discussed. By June 23, Zvi knew that the quarter's actual sales would not meet the forecast. From June 23 to the end of the quarter on June 30, Zvi was aware that products shipped from the warehouse fell short of projections and the extent of the shortfall of actual sales versus forecasted sales. The sales shortfall caused Taro to alter its production plans to avoid a buildup of inventory and to match production levels to reduced sales forecasts. Taro Canada's Director of Materials Management discussed the sudden sales shortfall and associated production

plan changes with Zvi, and as the end of the quarter approached, she, Zvi, and others at Taro made changes to the production plans in response to the falling sales.

39. During the period preceding Taro's July 29, 2004 earnings announcement, Zvi traded on the material, nonpublic information, and communicated the nonpublic information relating to the sales shortfall directly or indirectly to Amir, who traded on the material, nonpublic information, and tipped Heyman and Bahram with the information, each of whom also traded on the information. Amir also tipped Noga, and she traded Taro securities or agreed to provide Amir access to her account to trade them. Defendants made trades in the following accounts surrounding the July 29, 2004 earnings announcement:

| 7/29/2004 Earnings | | | | | |
|---|---|---|---|---|---|
| Defendant | Trade Date | BuySale | Qty | Description | Loss Avoided/Profit |
| | | | | | |
| **Aragon Partners' Account** | | | | | |
| | 6/25/2004 | B | 20 | Aug 45 Puts | |
| | 6/25/2004 | B | 20 | Aug 40 Puts | |
| | 6/25/2004 | B | 21 | Aug 40 Puts | |
| | 6/28/2004 | B | 39 | Aug 40 Puts | |
| | 7/6/2004 | B | 50 | Oct 40 Puts | |
| | 7/6/2004 | B | 50 | Aug 40 Puts | |
| | 7/29/2004 | B | 5,000 | TARO stock | |
| | 7/29/2004 | B | 5,000 | TARO stock | |
| | 7/29/2004 | B | 5,000 | TARO stock | |
| | 7/29/2004 | B | 5,000 | TARO stock | |
| | 8/2/2004 | S | (2,000) | TARO stock | |
| | 8/2/2004 | S | (13,000) | TARO stock | |
| | 8/2/2004 | S | (5,000) | TARO stock | $363,113.59 |
| | 6/29/2004 | S | (100) | Aug 40 Calls | |
| | 6/30/2004 | S | (100) | Aug 40 Calls | |
| | 7/1/2004 | S | (200) | Aug 40 Calls | |
| | 7/1/2004 | S | (23) | Aug 40 Calls | |
| | 7/1/2004 | S | (30) | Aug 40 Calls | |

| | | | | | |
|---|---|---|---|---|---|
| | 8/20/2004 | Expired | 453 | Aug 40 Calls | $ 261,934.58 |
| | 7/6/2004 | S | (10) | Oct 40 Calls | |
| | 7/6/2004 | S | (90) | Oct 40 Calls | |
| | 7/7/2004 | S | (10) | Oct 40 Calls | |
| | 7/7/2004 | S | (40) | Oct 40 Calls | |
| | 7/8/2004 | S | (150) | Oct 40 Calls | |
| | 7/8/2004 | S | (100) | Oct 40 Calls | |
| | 7/8/2004 | S | (50) | Oct 40 Calls | |
| | 10/15/2004 | Expired | 450 | Oct 40 Calls | $ 216,370.23 |
| | 7/6/2004 | S | (100) | Jan 40 Calls | |
| | 7/7/2004 | S | (50) | Jan 40 Calls | |
| | 7/7/2004 | S | (50) | Jan 40 Calls | |
| | 11/26/2004 | B | 200 | Jan 40 Calls | $ 121,487.18 |
| | | | | **Total Profit Aragon:** | **$ 962,905.58** |
| | | | | | |
| **Noga's Account** | | | | | |
| | 7/6/2004 | B | 20 | Aug 40 Puts | |
| | 7/6/2004 | B | 10 | Aug 40 Puts | |
| | 7/6/2004 | B | 20 | Aug 40 Puts | |
| | 7/6/2004 | B | 30 | Aug 40 Puts | |
| | 7/6/2004 | B | 10 | Aug 40 Puts | |
| | 7/6/2004 | B | 30 | Aug 40 Puts | |
| | 7/29/2004 | S | (20) | Aug 40 Puts | |
| | 7/29/2004 | S | (20) | Aug 40 Puts | |
| | 7/29/2004 | S | (20) | Aug 40 Puts | |
| | 7/29/2004 | S | (60) | Aug 40 Puts | $ 214,966.34 |
| | | | | | |
| **Zvi's Account** | | | | | |
| | 7/20/2004 | S | (30) | Sep 25 Calls | |
| | 9/17/2004 | Expired | 30 | Sep 25 Calls | $ 31,143.27 |
| | 6/28/2004 | S | 10,000 | TARO stock | |
| | | | | Loss Avoidance | $ 238,698.76 |
| | | | | **Total Profit Zvi** | **$ 269,842.03** |
| | | | | | |
| **Heyman's Account** | | | | | |
| | 7/6/2004 | S | (100) | TARO stock | |
| | 7/6/2004 | | | Loss avoidance | $ 1,904.90 |
| | 7/6/2004 | B | 25 | Aug 40 Puts | |
| | 7/29/2004 | S | (10) | Aug 40 Puts | |
| | 7/29/2004 | S | (15) | Aug 40 Puts | $ 40,065.93 |
| | 7/14/2004 | B | 40 | Aug 35 Puts | |

| | | | | | |
|---|---|---|---|---|---|
| | 7/29/2004 | S | (10) | Aug 35 Puts | |
| | 7/29/2004 | S | (30) | Aug 35 Puts | $ 41,845.83 |
| | | | | **Total Profit Heyman:** | **$ 83,816.66** |
| | | | | | |
| **Bahram's Account** | | | | | |
| | 7/12/2004 | S | (10) | Aug 35 Calls | |
| | 7/12/2004 | S | (270) | Aug 35 Calls | |
| | 7/15/2004 | S | (45) | Aug 35 Calls | |
| | 7/23/2004 | S | (50) | Aug 35 Calls | |
| | 8/20/2004 | Expired | 375 | Aug 35 Calls | $ 180,450.26 |
| | 7/19/2004 | S | (100) | Aug 30 Calls | |
| | 8/20/2004 | Expired | 100 | Aug 30 Calls | $ 62,837.53 |
| | | | | **Total Profit Bahram:** | **$ 243,287.79** |
| | | | | **Total Profit 7/29/2004 earnings:** | **$ 1,774,818.40** |

40.     In appreciation for the Taro tips Amir gave him concerning the July 29, 2004 earnings announcement, Heyman paid for a plasma television that Amir bought on August 29, 2004 for $6,645.

41.     In connection with the July 29, 2004 earnings announcement, Amir received approximately $66,000 from Bahram as a kickback of approximately 25% of the profits Bahram made on the announcement.

42.     Trading concerning the July 29, 2004 earnings release resulted in more than $1,700,000 in profits and losses avoided.

**May 29, 2001 Announcement of FDA Approval of CB Cream**

43.     On or about May 29, 2001, Taro announced that the FDA had approved its application to distribute a new generic drug, Clotrimazole/Betamethasone Dipropionate Cream USP ("CB Cream"). This information was material.

44.     By virtue of his responsibility for coordinating production and shipment of new product and because of his involvement in the PLC meetings, Zvi knew Taro's estimates of when it could expect FDA approval for CB Cream. From September through November 2000, Zvi attended PLC meetings where the group discussed the status of CB Cream production and progress in the FDA approval process. Zvi was in charge of the production plan for CB Cream, and was responsible for ensuring that Taro manufactured and packaged sufficient stocks of CB Cream so that it was ready to ship to distributors and customers immediately upon FDA approval. In March 2001, Zvi participated in PLC meetings and was aware that Taro expected FDA approval of CB Cream some time in April 2001. By May 2, 2001, Zvi was receiving daily reports from Taro's home offices in Israel concerning CB Cream production in anticipation of an expected approval from the FDA. By May 9, 2001, Taro employees involved in the product launch of CB Cream knew that FDA approval would most likely come by the first week of June 2001. On May 9, 2001, Taro learned in a conference call with the FDA that CB Cream was in "first generic drug review," which usually extends the FDA approval process by three to four weeks. Taro's Chairman and Vice Chairman communicated the FDA's schedule to the PLC. Also on May 9, 2001, Zvi assisted Taro's Director of Regulatory Affairs with preparing a response to FDA requests by translating documents written in Hebrew concerning production of CB Cream.

45.     On May 29, 2001, at 2:54 p.m., Taro received a fax from the FDA notifying it of the FDA's approval of CB Cream. Taro issued a press release at 5:26 p.m. the same day, announcing the FDA approval. Taro was the first generic manufacturer to enter the market with the product.

46.     Throughout the approval process for CB Cream, Zvi communicated

regularly, directly or indirectly, with Amir and Ayal, providing them with the material,

nonpublic information he possessed concerning the FDA approval for CB Cream, and

both Amir and Ayal traded options in advance of the announcement. The Defendants

made trades in the following accounts surrounding the May 29, 2001 announcement of

FDA Approval of CB Cream:

| 5/29/2001 | FDA approval for CB Cream | | | | |
|---|---|---|---|---|---|
| Defendant | Trade Date | Buy/Sale | Qty | Description | Profit |
| | | | | | |
| Amir's Account | | | | | |
| | 5/17/2001 | B | 100 | Jun 60 Calls | |
| | 5/17/2001 | B | 45 | Jun 60 Calls | |
| | 5/18/2001 | B | 55 | Jun 60 Calls | |
| | 5/29/2001 | B | 5 | Jun 60 Calls | |
| | 6/1/2001 | S | (50) | Jun 60 Calls | |
| | 6/1/2001 | S | (30) | Jun 60 Calls | |
| | 6/1/2001 | S | (30) | Jun 60 Calls | |
| | 6/1/2001 | S | (20) | Jun 60 Calls | |
| | 6/1/2001 | S | (20) | Jun 60 Calls | |
| | 6/1/2001 | S | (20) | Jun 60 Calls | |
| | 6/1/2001 | S | (20) | Jun 60 Calls | |
| | 6/1/2001 | S | (15) | Jun 60 Calls | $ 96,623.96 |
| | 5/23/2001 | B | 30 | Jul 65 Calls | |
| | 5/23/2001 | B | 20 | Jul 65 Calls | |
| | 6/1/2001 | S | (50) | Jul 65 Calls | $ 22,173.91 |
| | | | | Total Profit Amir: | $ 118,797.87 |
| Ayal's Account | | | | | |
| | 5/22/2001 | B | 1 | Jun 60 Call | |
| | 5/22/2001 | B | 2 | Jun 60 Calls | |
| | 5/22/2001 | B | 2 | Jun 60 Calls | |
| | 5/22/2001 | B | 2 | Jun 60 Calls | |
| | 5/25/2001 | B | 1 | Jun 60 Call | |
| | 5/30/2001 | S | (2) | Jun 60 Calls | |
| | 5/30/2001 | S | (3) | Jun 60 Calls | |
| | 5/30/2001 | S | (3) | Jun 60 Calls | $ 2,536.91 |
| | | | | Total Profit 5/29/01 FDA approval of CB Cream: | $ 121,334.78 |

47.     Trading concerning the May 29, 2001 announcement of FDA approval of CB Cream resulted in more than $121,000 in profits.

### July 19, 2001 Earnings Announcement

48.     On July 19, 2001, Taro announced that earnings for the second quarter of 2001 were a record for the company. Taro reported a 49% improvement of sales from the same quarter a year earlier, and net income of $6.1 million, or $0.48 per share. This information was material.

49.     By virtue of his position at Taro, his participation in Daily Meetings and his access to daily Sales Reports, Zvi knew that Taro's second quarter 2001 earnings would be strong. After the launch of CB Cream on May 29, 2001, Zvi knew that sales were strong at Taro, and on or about May 31, 2001, Zvi received an email from his supervisor stating that Taro expected to ship $3 million of CB Cream within the first twenty four hours following the product launch. Zvi knew that only one week after its launch, Taro had sold $40 million worth of CB Cream. On or about July 3, 2001, Zvi received the final sales data for the second quarter, which showed that Taro had $69.2 million in sales for the quarter, exceeding its quarterly forecast by 185%.

50.     During this time, Zvi communicated regularly, directly or indirectly, with Amir and Oren, providing them with the material, nonpublic information he possessed regarding the impending earnings release. Amir and Oren each traded options while in possession of material, nonpublic information that Zvi supplied.

51.     Amir and Oren made the following profits resulting from trading with material nonpublic information surrounding the July 19, 2001 earnings announcement:

| Defendant | Profit |
|---|---|
| Amir | $ 175,811 |
| Efrat (trading by Amir) | $ 18,848 |
| Oren | $ 37,042 |
| **Total Profit** | **$ 231,701** |

52.     Trading concerning the July 19, 2001 earnings announcement resulted in more than $231,000 in profits.

## October 18, 2001 Earnings Announcement

53.     On October 18, 2001 at approximately 7:02 a.m., Taro reported record third quarter earnings for 2001.  Taro reported approximately $41.4 million in sales, an increase of approximately 52% over the same quarter a year earlier, and an increase in net income of approximately 161% to $7.3 million, or $0.29 per share.  This information was material.

54.     By virtue of his position at Taro, prior to its public announcement, Zvi knew that Taro's third quarter earnings in 2001 would be strong.  Zvi's participation in Daily Meetings at Taro, and his constant access to daily Sales Reports, gave Zvi material, nonpublic information about Taro's sales and earnings for the record-breaking third quarter of 2001.

55.     During the time preceding Taro's third quarter 2001 earnings announcement, Zvi communicated regularly, directly or indirectly, with Amir and Oren, providing them with the material, nonpublic information he possessed about the impending earnings announcement.  With the material, nonpublic information, Zvi, Amir, and Oren all traded options in Taro for their own accounts, and/or accounts they controlled or had access to in advance of Taro's third quarter of 2001 earnings announcement.

56.    Zvi, Amir and Oren made the following profits resulting from trading while in possession of material nonpublic information surrounding the October 18, 2001 earnings announcement:

| Defendant | Profit |
|---|---|
| Zvi | $ 4,280 |
| Amir | $ 92,489 |
| Efrat (trading by Amir) | $ 45,266 |
| Oren | $ 46,860 |
| **Total Profit** | **$ 188,895** |

57.    Trading concerning the earnings announcement on October 18, 2001 resulted in more than $188,000 in profits.

### November 26, 2002 Announcement of
### FDA Approval of Econazole Nitrate Cream, 1%

58.    On November 26, 2002, Taro announced that the FDA had approved its application for approval of Econazole Nitrate Cream, 1% ("Econazole Cream"). This information was material.

59.    By virtue of his position at Taro and because of his attendance at PLC meetings, Zvi knew that Taro anticipated that it would be the first manufacturer to market generic Econazole Cream, and was frequently updated as to when Taro expected FDA approval. Zvi was involved from October 2001 to April 2002 in preparing validation batches for the FDA, and was responsible for making the necessary production preparations to be able to ship product to fill orders once final FDA approval was received.

60.    By early August 2002, Zvi knew that FDA approval and product launch were expected to occur during the fourth quarter 2002. After a meeting in August or September 2002, Taro's Vice Chairman told Taro's staff that the FDA would approve the

application, and that Taro expected approval within the next few months. Zvi knew that the PLC viewed Econazole Nitrate Cream as a profitable product with no generic competition in the market. On November 15, 2002, Zvi attended a PLC meeting where the group discussed the imminent FDA approval for Econazole Nitrate Cream.

61.    During this time, Zvi communicated regularly, directly or indirectly, with Amir, Oren and Ayal, providing them with the material, nonpublic information he possessed regarding the FDA's anticipated approval of Econazole Nitrate Cream. Each of them traded on the information.

62.    Amir, Oren and Ayal made the following profits resulting from trading with material nonpublic information surrounding the announcement of FDA approval of Taro's application to distribute Econazole Nitrate Cream:

| Defendant | Profit |
|-----------|--------|
| Amir | $16,484 |
| Oren | $10,833 |
| Ayal | $ 5,914 |
| **Total Profit** | **$ 33,231** |

63.    Trading surrounding the November 26, 2002 announcement resulted in more than $33,000 in profits.

### February 20, 2003 Earnings Announcement

64.    On February 20, 2003, Taro announced record results for both the fourth quarter of 2002, and for the year ending December 31, 2002. Fourth quarter sales and year-long sales each increased 43%, with annual net income increasing approximately 71% to $44,500,000, or approximately $1.52 per share. This information was material.

65.     By virtue of his position at Taro and his constant access to the daily Sales Reports, Zvi knew about the increased sales levels at Taro, and knew that the company's income was dramatically increasing.

66.     In early 2002, Zvi communicated regularly, directly or indirectly, with Amir, Ayal and Oren, and provided them with the material, nonpublic information he possessed about the company's earnings. Zvi, Amir, Ayal and Oren each traded on the information Zvi stole from Taro. Amir tipped his then-fiancée Noga, and she traded Taro securities or agreed to provide Amir access to her account to trade them.

67.     Zvi, Amir, Noga, Ayal and Oren made the following profits resulting from trading with material nonpublic information surrounding the February 20, 2003 earnings announcement:

| Defendant | Profit |
|---|---|
| Zvi | $ 3,322 |
| Amir | $ 4,409 |
| Efrat (trading by Amir) | $ 4,414 |
| Noga | $ 511 |
| Oren | $ 6,217 |
| Ayal | $17,604 |
| **Total Profits** | **$36,477** |

68.     Trading surrounding the February 20, 2003 earnings announcement resulted in more than $36,000 in profits.

### April 16, 2003 Earnings Announcement

69.     On April 16, 2003, Taro announced record earnings for the first quarter of 2003. Sales had increased 55% and net income increased 42% to $0.47 per share. This information was material.

70.     By virtue of his position at Taro and his constant access to the daily Sales Reports, Zvi knew that earnings would again be positive for Taro.

71.     Leading up to the earnings announcement on April 16, 2003, Zvi communicated regularly, directly or indirectly, to Amir and Oren, providing them with the material, nonpublic information he possessed concerning the impending earnings announcement. Oren then either traded Taro securities in his account or agreed to provide Amir access to his account so Amir could do so.

72.     Oren made the following profits resulting from trading with material nonpublic information surrounding the April 16, 2003 earnings announcement:

| Defendant | Profit |
|-----------|--------|
| Oren | $20,869 |

73.     Trading surrounding Taro's April 16, 2003 earnings announcement resulted in more than $20,000 in profits.

### April 29, 2004 Earnings Announcement

74.     On April 29, 2004, Taro announced its earnings for the first quarter of 2004. Taro reported that earnings fell 21% in the first quarter compared with the first quarter of 2003, with earnings of $11.1 million, or $0.37 per share. The earnings failed to meet analysts' expectations of $0.53 per share. This information was material.

75.     By virtue of his position at Taro, and his constant access to the daily Sales Reports, Zvi knew that sales during the first quarter of 2004 were disappointing. By the middle of the first quarter, Zvi knew that Taro's executive committee was discussing the fact that gross sales were not meeting expectations.

76.     In the time leading up to the April 29, 2004 announcement, Zvi communicated regularly, directly or indirectly, to Amir, providing him with the material,

nonpublic information he possessed concerning the impending earnings announcement. Amir then traded on the information. After receiving the information from Zvi, Amir tipped Heyman, who traded on the information. Zvi also traded on the information.

77. Zvi, Aragon Partners and Heyman made the following profits resulting from trading with material nonpublic information surrounding the April 29, 2004 earnings announcement:

| Defendant | Profit |
|---|---|
| Zvi | $3,243 |
| Aragon Partners | $2,060 |
| Heyman | $107 |
| Total Profit: | $ 5,410 |

78. Trading surrounding Taro's April 29, 2004 earnings announcement resulted in more than $5,400 in profits.

**August 20, 2004 Announcement of FDA Approval of Loratadine Syrup**

79. On August 20, 2004, Taro announced that the FDA approved its application to distribute Loratadine Syrup. This information was material.

80. Because of his involvement with the PLC, in or about April 2004, Zvi knew that FDA approval of Loratadine Syrup was expected by August 2004. On July 15, Zvi attended a PLC meeting at which final FDA approval for Loratadine Syrup was anticipated in September 2004. On August 12, the estimate for FDA approval was moved back to November or December 2004. Between August 12 and August 19, 2004, Zvi learned that FDA approval had been moved up to August and was imminent.

81. Throughout the time leading up to the announcement of the FDA approval of Loratadine Syrup, Zvi communicated regularly, directly or indirectly, with Amir and Oren, and provided them with the material, nonpublic information he possessed

regarding Taro's application for FDA approval of Loratadine Syrup. Amir then tipped Noga, and she traded Taro securities or agreed to provide Amir access to her account to trade them. Amir also tipped Heyman with the material, nonpublic information that Zvi supplied. Aragon Partners, Amir, Oren, and Heyman each traded with the information Zvi supplied. In addition to tipping others, Zvi traded in Taro securities in his own account at Israeli Discount Bank while in possession of the material, non-public information.

82.     Zvi, Aragon Partners, Noga, Oren and Heyman made the following profits resulting from trading with material nonpublic information surrounding the announcement of FDA approval of Taro's distribution of Loratadine Syrup:

| Defendant | Profit |
| --- | --- |
| Zvi | $ 37,800 |
| Aragon Partners | $ 46,184 |
| Noga | $ 8,151 |
| Oren | $ 231 |
| Heyman | $1,663 |
| **Total Profit:** | **$ 94,029** |

83.     Trading surrounding the announcement that the FDA had approved Taro's Loratadine Syrup application resulted in more than $94,000 in profits.

### March 2, 2005 Announcement of FDA Approval Of Miconazole Nitrate Vaginal Cream, 4%

84.     On March 2, 2005, Taro announced FDA approval for its product Miconazole Nitrate Vaginal Cream, 4% ("Miconazole Cream"). This information was material.

85.     By virtue of his position, which included coordinating production schedules for newly-FDA-approved products at Taro, and his participation in PLC meetings, Zvi knew Taro's estimates of when the FDA would approve the product. At a

meeting on January 13, 2005, Zvi was told that the FDA approval was anticipated shortly. At the January 27 and February 3 meetings, Zvi was told that FDA approval was expected in February. At the February 10 meeting, Zvi was told that the FDA's review was complete, and that the application was circulating for the FDA officials' signatures. Approximately one week later, at another PLC meeting, Zvi was told that approval by the end of February remained the best estimate.

86.     Throughout the time leading up to the FDA approval of Miconazole Cream, Zvi communicated regularly, directly or indirectly, with Amir, Oren, and Ayal, providing them with the material, nonpublic information he possessed concerning Taro's application for FDA approval of Miconazole Cream. Each of them traded on the information. Amir then tipped Noga, and she traded Taro securities or agreed to provide Amir access to her account to trade them. Amir also tipped Heyman with the material, nonpublic information Zvi had supplied and Heyman traded on the information.

87.     Aragon Partners, Amir, Noga, Oren, Ayal and Heyman made the following profits resulting from trading with material nonpublic information surrounding the announcement of FDA approval of Taro's application to distribute Miconazole Cream:

| Defendant | Profit |
|---|---|
| Aragon Partners | $ 276,275 |
| Noga | $ 25,794 |
| Oren | $11,637 |
| Ayal | $ 2,655 |
| Heyman | $ 24,213 |
| Total Profit | $ 340,574 |

88.     Trading surrounding the March 2, 2005 announcement resulted in more than $340,000 in profits.

### April 14, 2005 Announcement of FDA
### Approval of Ciclopirox Olamine Cream

89.     On April 14, 2005, Taro announced that the FDA had approved its application to distribute Ciclopirox Olamine Cream.  This information was material.

90.     By virtue of his position at Taro as the person responsible for coordinating production in anticipation of the launch of new products, his participation in PLC meetings, and his participation in at least four additional meetings at which the progress of the FDA review of Ciclopirox Olamine Cream was discussed, Zvi tracked the FDA approval process for Ciclopirox Olamine Cream, and organized its production in anticipation of FDA approval.  On March 31, at a PLC meeting, Zvi learned that FDA approval was expected during the week of April 15.

91.     Throughout the time preceding Taro's April 14, 2005 announcement, Zvi communicated regularly, directly or indirectly, with Amir and Oren, and provided them with material, nonpublic information concerning Taro's application for FDA approval of Ciclopirox Olamine Cream.  Amir and Oren traded on the information.  Amir then tipped Noga, and she traded Taro securities or agreed to provide Amir access to her account to trade them..  Amir also tipped Heyman, who traded on the information.

92.     In addition to tipping others, Zvi traded in Taro securities in his own account at Israeli Discount Bank while in possession of the material, non-public information.

93.     Aragon Partners, Zvi, Amir, Noga, Oren and Heyman made the following profits resulting from trading with material nonpublic information surrounding the announcement of FDA approval of Taro's application to distribute Ciclopirox Olamine Cream:

| Defendant | Profit |
|---|---|
| Aragon Partners | $ 190,224 |
| Noga | $ 99,718 |
| Oren | $ 371 |
| Heyman & Son | $ 2,667 |
| **Total Profit** | **$ 292,983** |

94.     Trading surrounding the April 14, 2005 announcement resulted in more than $292,000 in profits.

### April 26, 2005 Earnings Announcement

95.     On April 26, 2005, Taro announced its first quarter earnings for 2005. Taro's earnings were down compared with the first quarter of 2004. Taro reported that profits declined 55%, compared to the first quarter of 2004, to $5 million, or $0.17 per share . Sales for the first quarter fell 6.6% to $78.5 million compared with $84.1 million for the first quarter 2004. Analysts expected earnings per share to be $0.21. This information was material.

96.     By virtue of his position at Taro and because of his constant access to the daily Sales Reports, among other things, Zvi knew material, nonpublic information concerning Taro's quarterly earnings prior to its announcement.

97.     During the time prior to the April 26, 2005 announcement, Zvi communicated regularly, directly or indirectly, with Amir and Oren, and provided them with material, nonpublic information concerning Taro's upcoming earnings release. Both of them traded on the information. Amir tipped Heyman with the material, nonpublic information that Zvi had supplied, and he traded on the information.

98.     Aragon Partners, Oren and Heyman made the following profits by trading with material nonpublic information surrounding the April 26, 2005 earnings announcement:

| Defendant | Profit |
| --- | --- |
| Aragon Partners | $ 128,580 |
| Oren | $ 431 |
| Heyman & Son | $ 3,473 |
| **Total Profit** | **$ 132,484** |

99.     Trading surrounding the April 26, 2005 earnings announcement resulted in more than $132,000 in profits.

**B.     The Scheme to Steal Information from Public Accounting Firms**

100.·     In addition to trades based on material, nonpublic information from Taro, Amir, Ayal, Heyman, and Kim misappropriated and traded on material, nonpublic information concerning possible mergers of public companies from Heyman's employer, E&Y and Ayal's employer, PwC.

101.     When Heyman and Ayal misappropriated the information, both E&Y and PwC had extensive confidentiality policies that emphasized to employees the importance of maintaining the confidentiality of information obtained through their work at E&Y and PwC.

### Heyman's Project AA Tip

102.     On the morning of April 28, 2005, Heyman was assigned by E&Y to a due diligence project with the code name "Project AA" for a public company client ("Company A"), which was considering acquiring another public company ("Company B"). Heyman's supervisors assigned him the task of reviewing Company B's financial data to determine whether it was a suitable merger candidate with Company A. Heyman's supervisors also instructed him that the information pertaining to the potential merger was confidential.

103.     On April 28, the day Heyman was assigned to Project AA, at 12:24 p.m., Amir called Heyman's cell phone. During the call, Heyman provided Amir with the material, nonpublic information concerning the contemplated merger. Approximately six minutes after the phone call ended, Amir began buying securities of Company B in Aragon Partners' account.

104.     The next day, on April 29, Heyman's supervisor forwarded Heyman an email from the engagement partner, which re-emphasized the confidentiality of client information regarding Project AA, and he reminded Heyman that Project AA was a confidential project.

105.     In early May 2005, Amir tipped Kim with the confidential information he had received from Heyman concerning the companies involved in Project AA. On May 5 and 6, Kim bought call options for Company B.

106.     The merger anticipated in Project AA did not occur.

### Ayal's Project Victor Tip

107.     In April 2005, Ayal transferred from PwC's Audit Services Group to the Transaction Services Group, a group at PwC that provides analytical services to PwC clients considering mergers or other transactions. In connection with his transfer, Ayal was required to attend a special presentation about the importance of maintaining the confidentiality of the material, nonpublic information to which Transaction Services had access. This training reiterated PwC's general policies of which Ayal was already aware, but focused on the special issues presented by work with the Transactional Services Group. Part of the presentation included a general recitation of the facts involved in *SEC v. Drescher*, No. 99 Civ. 1418 (SAS), 1999 WL 946864 (S.D.N.Y. 1999), in which a former PwC manager, who disclosed material, nonpublic information about a merger he

was working on to a friend, was found reckless and therefore liable under Section 10(b) and Rule 10b-5 of the Exchange Act. The PwC partner who gave the presentation emphasized the importance of confidentiality and cautioned the audience, including Ayal, to take extensive measures to maintain the confidentiality of information that the Transaction Services Group learned during the course of its work.

108. In late May 2005, Ayal started working on a possible merger code-named "Project Victor." Ayal's supervisors told him that Project Victor involved two publicly traded companies, and that PwC's client was the target company ("Company C"). Ayal's supervisors assigned him to the task of reviewing financial statements of the acquiring company ("Company D") as part of the due diligence work related to the transaction. Ayal's supervisors further instructed him that the information pertaining to the transaction was confidential.

109. During the last week of May, before leaving for the Memorial Day holiday, Ayal reviewed audit files of Company D at the offices of E&Y. By the end of the Memorial Day holiday weekend, Ayal communicated material, nonpublic information to Amir concerning the proposed merger. On the first trading day following the Memorial Day holiday, May 31, 2005, between 9:35 a.m. and 12:44 p.m., Amir sold Company C put options in Aragon Partners' brokerage account. The following morning, Amir sold additional Company C put options. Additionally, Amir tipped Kim about Project Victor, and on June 1 and 2, Kim bought Company C June call options based on the tip from Amir.

110. On Friday June 3, at approximately lunch time, senior management at Company C, PwC's Project Victor client, called PwC to inform them that the deal had been indefinitely postponed.

111. On June 3, immediately after learning the news at lunch, another member of the PwC Project Victor team called Ayal and told him that the deal was off. Shortly thereafter, Ayal conveyed this material, nonpublic information to Amir, and at approximately 1:57 p.m. on June 3, Amir liquidated his positions.

## CLAIMS FOR RELIEF

112. By virtue of the foregoing, and as set forth below, Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Bahram, Kim, and Heyman & Son, in connection with the purchase or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which would operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

113. Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Bahram, Kim, and Heyman & Son, engaged in the conduct described above knowingly or with recklessness.

114. By reason of the foregoing, Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Bahram, Kim, and Heyman & Son, violated, and unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

115. By virtue of the foregoing, and as set forth below, Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Bahram, and Heyman & Son, in connection with the offer or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and (c) engaged in transactions, practices and courses of business which would operate as a fraud or deceit upon the purchaser.

116. Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Bahram, and Heyman & Son, engaged in the conduct described above knowingly or with recklessness.

117. By reason of the foregoing, Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Bahram, and Heyman & Son, violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT I
### (Trading in Taro Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder as to Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Bahram, Kim, and Heyman & Son)

118. Paragraphs 1 through 117 are realleged and incorporated herein by reference.

119. Prior to each of the public announcements of FDA approval of Taro's application to distribute new drugs referred to herein -- specifically, the announcements relating to FDA approval of CB Cream, Econazole Cream, Loratadine Syrup, Miconazole Cream, and Ciclopirox Olamine Cream (the "FDA Announcements") -- information relating to the FDA approval and Taro's estimates of when it would occur (the "FDA Approval Information") was material, nonpublic information. In addition, the FDA Approval Information was considered confidential by Taro, and was intended solely for internal corporate use.

120. Prior to each of the public announcements of Taro's quarterly earnings referred to herein – specifically, the announcements on July 19, 2001; October 18, 2001; February 23, 2003; April 16, 2003; April 29, 2004; July 29, 2004; April 26, 2005; and November 17, 2005 (the "Earnings Announcements") – information relating to Taro's quarterly performance, including information relating to sales, inventory, and production during the quarter (the

"Financial Information"), was material, nonpublic information. The Financial Information also was considered confidential by Taro, and was intended solely for internal corporate use.

121.     Zvi learned of the FDA Approval Information and the Financial Information in the course of his employment at Taro. Zvi knew, or was reckless in not knowing, the fact that he owed Taro a fiduciary duty to maintain such information in confidence until it was publicly disseminated.

122.     In breach of a fiduciary duty or similar relationship of trust or confidence owed to Taro, Zvi misappropriated the material, nonpublic FDA Approval Information and Financial Information by communicating this information, directly or indirectly, to Amir, Ayal, Noga and Oren, while expecting to benefit from his disclosure. Amir, Ayal, Noga and Oren knew, or were reckless in not knowing, that the FDA Approval Information and Financial Information they learned about Taro from Zvi was material and nonpublic, and had been misappropriated and/or disclosed to them in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any Taro securities or tip others so that they could purchase or sell any Taro securities while possessing such information.

123.     Notwithstanding their respective obligations, Zvi, Amir, Ayal, Noga and Oren agreed that Zvi, Amir, Ayal, Noga and Oren would trade in Taro securities. As described above and in connection with this agreement, Zvi, Amir, Ayal, Noga and Oren traded in Taro securities as described above while in possession of this misappropriated, material, nonpublic information.

124.     Each of the trades executed prior to the announcements by Zvi, Amir, Ayal, Noga and Oren described above constituted a separate direct or indirect violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

125. Also in violation of his obligations, Amir tipped Heyman with material, nonpublic information about Taro securities while expecting to benefit from the disclosure. Heyman traded on Amir's tip and knew, or was reckless in not knowing, that the Financial Information relating to the July 29, 2004; November 17, 2005; and April 26, 2005 earnings announcements; and the FDA Approval Information relating to the distribution of Miconazole Cream; Ciclopirox Olamine Cream; and Loratadine Syrup that he learned about Taro was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not purchase or sell any Taro securities while possessing such information.

126. Each of the trades executed prior to the announcements by Heyman constituted a separate direct or indirect violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

127. Also in violation of his obligations, Amir tipped Bahram with material, nonpublic information about Taro securities while expecting to benefit from the disclosure. Bahram traded on Amir's tip and knew, or was reckless in not knowing, that the Financial Information relating to the July 29, 2004 earnings announcement that he learned about Taro was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not purchase or sell any Taro securities while possessing such information.

128. Each of the trades executed prior to the announcements by Bahram described above constituted a separate direct or indirect violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

129. Also in violation of his obligations, Amir tipped Kim with material, nonpublic information about Taro securities while expecting to benefit from the disclosure. Kim traded on

Amir's tip and knew, or was reckless in not knowing, that the Financial Information relating to the November 17, 2005 earnings announcements that he learned about Taro was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not purchase or sell any Taro securities while possessing such information.

130.    Each of the trades executed prior to the announcements by Kim described above constituted a separate direct or indirect violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

131.    Each of the Defendants is liable for the disgorgement of ill-gotten profits or losses avoided that each realized through any insider trading in Taro securities, and Zvi, Amir, Noga, Oren, and Ayal are jointly and severally liable for all the trading profits and losses avoided through any insider trading in Taro securities.

## COUNT II
**(Trading in Taro Securities in Violation of Section 17(a) of the Securities Act as to Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Bahram, and Heyman & Son)**

132.    Paragraphs 1 through 131 are realleged and incorporated herein by reference.

133.    Prior to each of the FDA Announcements, the FDA Approval Information was material, nonpublic information. In addition, the FDA Approval Information was considered confidential by Taro, and was intended solely for internal corporate use.

134.    Prior to each of the Earnings Announcements, the Financial Information was material, nonpublic information. The Financial Information also was considered confidential by Taro, and was intended solely for internal corporate use.

135.    Zvi learned of the FDA Approval Information and the Financial Information in the course of his employment at Taro. Zvi knew, or was reckless in not knowing, the fact that he

owed Taro a fiduciary duty to maintain such information in confidence until it was publicly disseminated.

136.    In breach of a fiduciary duty or similar relationship of trust or confidence owed to Taro, Zvi misappropriated the material, nonpublic FDA Approval Information and the Financial Information, and communicated this information, directly or indirectly, to Amir, Ayal, Noga and Oren, while expecting to benefit from his disclosure. Amir, Ayal, Noga and Oren knew, or were reckless in not knowing, that the FDA Approval Information and Financial Information they learned about Taro from Zvi was material and nonpublic, and had been misappropriated and/or disclosed to them in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not offer or sell any Taro securities or tip others so that they could offer or sell any Taro securities while possessing such information.

137.    Notwithstanding their respective obligations, Zvi, Amir, Ayal, Noga and Oren agreed that Zvi, Amir, Ayal, Noga and Oren would trade in Taro securities. As described above and in connection with this agreement, Zvi, Amir, Ayal, Noga and Oren traded in Taro securities as described above while in possession of this misappropriated, material, nonpublic information.

138.    Each of the trades involving an offer or sale of Taro securities executed prior to the announcements by Zvi, Amir (on behalf of himself, Aragon Partners, Noga and/or Efrat), Ayal, Noga and Oren described above constituted a separate direct or indirect violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

139.    Also in violation of his obligations, Amir tipped Heyman with material, nonpublic information about Taro securities while expecting to benefit from the disclosure. Heyman traded on Amir's tip and knew, or was reckless in not knowing, that the Financial Information relating to the July 29, 2004; November 17, 2005; and April 26, 2005 earnings announcements; and the FDA Approval Information relating to the distribution of Miconazole Cream; Ciclopirox

Olamine Cream; and Loratadine Syrup that he learned about Taro was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not offer or sell any Taro securities while possessing such information.

140.    Each of the trades involving an offer or sale of Taro securities executed prior to the announcements by Heyman described above constituted a separate direct or indirect violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

141.    Also in violation of his obligations, Amir tipped Bahram with material, nonpublic information about Taro securities while expecting to benefit from the disclosure. Bahram traded on Amir's tip and knew, or was reckless in not knowing, that the Quarterly Performance Information relating to the July 29, 2004 earnings announcement that he learned about Taro was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not offer or sell any Taro securities while possessing such information.

142.    Each of the trades involving an offer or sale of Taro securities executed prior to the announcements by Bahram described above constituted a separate direct or indirect violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

143.    Each of the Defendants is liable for the disgorgement of ill-gotten profits or losses avoided that each realized through any insider trading in Taro securities, and Zvi, Amir, Oren, Noga and Ayal are jointly and severally liable for all the trading profits and losses avoided through any insider trading in Taro securities.

## COUNT III

**(Trading in Other Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Aragon Partners, Aragon Capital, Amir, Ayal, Kim, and Heyman)**

144. Paragraphs 1 through 143 are realleged and incorporated herein by reference.

145. Prior to any public announcement concerning the companies involved in Project AA, information concerning the possible transaction was material, nonpublic information. This information was also considered confidential by E&Y, and was intended solely for internal corporate use on behalf of its client, Company A.

146. Heyman learned of the information concerning the possible merger of companies involved in Project AA in the course of his employment at E&Y. Heyman further knew, or was reckless in not knowing, that he owed E&Y a fiduciary duty to maintain such information in confidence until it was publicly disseminated, and that he owed Company A shareholders a duty to abstain from disclosing this information for the purpose of obtaining personal gain.

147. In breach of these fiduciary duties or similar relationships of trust or confidence owed to E&Y and Company A shareholders, Heyman misappropriated material, nonpublic information about the possible merger of Company A and Company B, and, while in possession of this information, communicated this information, directly or indirectly, to Amir, while expecting to benefit from his disclosure.

148. Amir knew, or was reckless in not knowing that the information he learned about Project AA was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not purchase or sell any Company A or Company B securities or tip others so that they could purchase or sell any Company A or Company B securities while possessing such information.

149.    Notwithstanding his obligations, Amir, on behalf of Aragon Partners, traded in Company B securities while in possession of this misappropriated, material, nonpublic information.

150.    By the conduct described above, Defendants Aragon Partners, Aragon Capital, Amir, and Heyman directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

151.    Notwithstanding his obligations to refrain from disclosing the material nonpublic information, Amir tipped Kim with material nonpublic information concerning Company A or Company B securities while expecting to benefit from the disclosure. Kim traded on Amir's tip and knew, or was reckless in not knowing, that the information he learned about Company A and Company B was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not purchase or sell any Company A or Company B securities while possessing such information.

152.    Notwithstanding his obligations, as described above, Kim traded securities of Company B while in possession of this misappropriated, material, nonpublic information.

153.    By the conduct described above, Defendant Kim directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

154.    Prior to any public announcement concerning the companies involved in Project Victor, information concerning the possible transaction was material, nonpublic information. This information was also considered confidential by PwC, and was intended solely for internal corporate use on behalf of its client, Company C.

155. Ayal learned of the information concerning the possible merger of companies involved in Project Victor in the course of his employment at PwC. Ayal further knew, or was reckless in not knowing that he owed PwC a fiduciary duty to maintain such information in confidence until it was publicly disseminated, and that he owed Company C's shareholders a duty to abstain from disclosing this information for the purpose of obtaining personal gain.

156. In breach of these fiduciary duties or similar relationships of trust or confidence owed to PwC and Company C shareholders, Ayal misappropriated material, nonpublic information about the possible merger of Company C and Company D, and, while in possession of this information, communicated this information, directly or indirectly, to Amir, while expecting to benefit from his disclosure.

157. Amir knew, or was reckless in not knowing that the information he learned about Project Victor was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not purchase or sell any Company C or Company D securities or tip others so that they could purchase or sell any Company C or Company D securities while possessing such information.

158. Notwithstanding his obligations, Amir, on behalf of Aragon Partners, traded in Company C securities while in possession of this misappropriated, material, nonpublic information.

159. By the conduct described above, Defendants Aragon Partners, Aragon Capital, Amir, and Ayal directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

160. Notwithstanding his respective obligations, Amir tipped Kim with material nonpublic information concerning Company C or Company D securities, while expecting to

benefit from the disclosure. Kim traded on Amir's tip and knew, or was reckless in not knowing, that the information he learned about Company C and Company D was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not purchase or sell any Company C or Company D securities while possessing such information.

161. Notwithstanding his obligations, as described above, Kim traded securities of Company C while in possession of this misappropriated, material, nonpublic information.

162. By the conduct described above, Defendant Kim directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT IV
### (Trading in Other Securities in Violation of Section 17(a) of the Securities Act as to Defendants Aragon Partners, Aragon Capital, Amir, Ayal, and Heyman)

163. Paragraphs 1 through 162 are realleged and incorporated herein by reference.

164. Prior to any public announcement concerning the companies involved in Project AA, information concerning the possible transaction was material, nonpublic information. This information was also considered confidential by E&Y, and was intended solely for internal corporate use on behalf of its client, Company A.

165. Heyman learned of the information concerning the possible merger of companies involved in Project AA in the course of his employment at E&Y. Heyman further knew, or was reckless in not knowing, that he owed E&Y a fiduciary duty to maintain such information in confidence until it was publicly disseminated, and that he owed Company A shareholders a duty to abstain from disclosing this information for the purpose of obtaining personal gain.

166. In breach of these fiduciary duties or similar relationships of trust or confidence owed to E&Y and Company A shareholders, Heyman misappropriated material, nonpublic

information about the possible merger of Company A and Company B, and, while in possession of this information, communicated this information, directly or indirectly, to Amir, while expecting to benefit from his disclosure.

167.    Amir knew, or was reckless in not knowing that the information he learned about Project AA was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not offer or sell any Company A or Company B securities or tip others so that they could offer or sell any Company A or Company B securities while possessing such information.

168.    Notwithstanding his obligations, Amir, on behalf of Aragon Partners, traded in Company B securities while in possession of this misappropriated, material, nonpublic information.

169.    By the conduct described above, for any trading involving the offer or sale of Company A or Company B securities, Defendants Aragon Partners, Aragon Capital, Amir, and Heyman directly or indirectly, violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

170.    Prior to any public announcement concerning the companies involved in Project Victor, information concerning the possible transaction was material, nonpublic information. This information was also considered confidential by PwC, and was intended solely for internal corporate use on behalf of its client, Company C.

171.    Ayal learned of the information concerning the possible merger of companies involved in Project Victor in the course of his employment at PwC. Ayal further knew, or was reckless in not knowing that he owed PwC a fiduciary duty to maintain such information in confidence until it was publicly disseminated, and that he owed Company C's shareholders a duty to abstain from disclosing this information for the purpose of obtaining personal gain.

172. In breach of these fiduciary duties or similar relationships of trust or confidence owed to PwC and Company C shareholders, Ayal misappropriated material, nonpublic information about the possible merger of Company C and Company D, and, while in possession of this information, communicated this information, directly or indirectly, to Amir, while expecting to benefit from his disclosure.

173. Amir knew, or was reckless in not knowing that the information he learned about Project Victor was material and nonpublic, and had been misappropriated and/or disclosed to him in violation of a fiduciary duty or similar relationship of trust or confidence, and that he could not offer or sell any Company C or Company D securities or tip others so that they could offer or sell any Company C or Company D securities while possessing such information.

174. Notwithstanding his obligations, Amir traded in Company C securities while in possession of this misappropriated, material, nonpublic information.

175. By the conduct described above, for any trading involving an offer or sale of Company C or Company D securities, Defendants Aragon Partners, Aragon Capital, Amir, and Ayal directly or indirectly, violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## **RELIEF SOUGHT**

**WHEREFORE**, the Commission respectfully requests that this Court enter a judgment:

### I.

Permanently restraining and enjoining each of the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder;

### II.

Permanently restraining and enjoining Defendants, Aragon Partners, Aragon Capital, Zvi,

Amir, Oren, Ayal, Noga, Heyman, Heyman & Son, and Bahram, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act;

### III.

Ordering the Defendants and Relief Defendants to disgorge all profits and ill-gotten gains realized from all the unlawful trading set forth herein, plus prejudgment interest;

### IV.

Ordering that Defendants Zvi, Amir, Ayal, Noga and Oren be held jointly and severally liable for Defendants Aragon Partners, Aragon Capital, Zvi, Amir, Oren, Ayal, Noga, Heyman, Heyman & Son, Kim and Bahram's disgorgement plus prejudgment interest and for Relief Defendants Efrat and Rivka's disgorgement plus prejudgment interest.

### V.

Ordering the Defendants to pay civil monetary penalties pursuant to Section 21A and/or Section 21(d)(3) of the Exchange Act;

### VI.

Ordering that Zvi be barred from serving as an officer or director of any pubic company pursuant to Section 21(d)(2) of the Exchange Act; and

## VII.

Granting such other relief as this Court may deem just and appropriate.


Dated: New York, New York
       March 22, 2007

                                   SECURITIES AND EXCHANGE
                                   COMMISSION

                                   BY: _____
                                         Mark K. Schonfeld (MS-2798)

                                   Regional Director
                                   Attorney for Plaintiff
                                   Northeast Regional Office
                                   3 World Financial Center, Room 4300
                                   New York, New York 10281
                                   (212) 336-1020


Of Counsel:
Nancy A. Brown
Gwen Licardo
Jonathan M. Redwine

## APPENDIX A: Flow of Inside Information Among Defendants



Blue Arrows – Taro Inside Information
Red Arrows – PwC Merger Inside Information
Silver Arrows – E&Y Merger Inside Information
Green Arrows – Money or Kickbacks
Black Arrow – Control over Aragon