UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

SECURITIES AND EXCHANGE                  :
COMMISSION,
                                         :

                        Plaintiff,       :          **MEMORANDUM**

                                         :          **DECISION AND ORDER**

          -against                       
                                         :          07 Civ. 919 (FM)

ARAGON CAPITAL MANAGEMENT,
 LLC, et al.,                            :

                        Defendants.      :

---------------------------------------------------------x

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:__11/24/2009____ |

**FRANK MAAS,** United States Magistrate Judge.

          This case arises out of an insider trading scheme involving the family of

defendant Zvi Rosenthal ("Zvi"), a former senior executive of Taro Pharmaceutical

Industries, Ltd. ("Taro"or the "Company"), an Israeli company whose shares are traded

on the NASDAQ national market.  In a related criminal case, three members of the

Rosenthal family, and David Heyman ("Heyman"), a family friend, each pleaded guilty in

connection with the insider trading scheme to a charge of conspiring to commit securities

fraud.

          The plaintiff Securities and Exchange Commission ("SEC" or the

"Commission") has now moved for partial summary judgment with respect to four

alleged instances of insider trading, seeking relief against Zvi, three of his sons,

defendants Amir Rosenthal ("Amir"), Ayal Rosenthal ("Ayal"), and Oren Rosenthal

("Oren"), and two "relief" defendants, Zvi's daughter Efrat Rosenthal ("Efrat"), and his

wife Rivka Rosenthal ("Rivka") (together, the "Relief Defendants). Zvi, Amir, Ayal,

Oren, and the Relief Defendants are hereinafter referred to collectively as the

"Defendants."

    In July 2007, the parties consented to my exercise of jurisdiction over this

case for all purposes pursuant to 28 U.S.C. § 636(c). (See Docket Nos. 48-49). For the

reasons set forth below, I now grant in part and deny in part the Commission's motion for

partial summary judgment (Docket No. 129).

I.    Relevant Facts

    The following facts are either undisputed or set forth in the light most

favorable to the Defendants.

    A.    Defendants

    Zvi is married to Rivka and is the father of Amir, Ayal, Oren, and Efrat.

(Pl.'s 56.1 Stmt. ¶ 9; Defs.' 56.1 Stmt. ¶ 9).[1]  Between 2001 and 2005, Zvi was the Vice

---

[1]    "Pl.'s 56.1 Stmt." refers to the Commission's Rule 56.1 Statement of Undisputed
Facts (Docket No. 130); "Pl.'s Mem." refers to the Commission's Memorandum of Law in
Support of its Motion for Partial Summary Judgment (Docket No. 135); "Compl." refers to the
Amended Complaint filed by the Commission (Docket No. 4); "D'Avino Decl." refers to the
Declaration of James D'Avino, dated Sept. 30, 2008, as supplemented on Dec. 17, 2008 (Docket
Nos. 133, 149); "Ex." refers to the exhibits annexed to the Declaration of Nancy A. Brown, Esq.,
dated September 20, 2008 ("Brown Decl."); "Brown Decl. II" refers to the Declaration of Ms.
Brown dated December 17, 2009: "Def.'s 56.1 Stmt." refers to the Amended Rule 56.1
Statement of Zvi, Amir, and Ayal (Docket No. 156); R. Defs.' 56.1 Stmt. refers to the Rule 56.1
Statement of Oren and the Relief Defendants (Docket No. 145);"Def.'s Mem." refers to the Joint
Memorandum of Law of Zvi, Amir, and Ayal (Docket No. 141); "Amir Decl." refers to the
                                                            (continued...)

President of Materials Management at Taro.   In that capacity, he had access to material

nonpublic information concerning the Company.  (Pl.'s 56.1 Stmt. ¶ 22; Defs.' 56.1 Stmt.

¶ 22).  The Commission contends in this motion that he and others misused that nonpublic

information on at least two occasions.  The Commission further contends that Amir and

Ayal, among others, also misused material nonpublic information concerning two other

companies.

B.    Insider Transactions Involving Taro

The first instance of insider trading related to Taro arises out of an

announcement, on May 29, 2001, that the United States Food and Drug Administration

("FDA") had approved Taro's application to distribute a new generic drug,

Clotrimazole/Betamethasone Diprorionate Cream USP ("CB Cream").  (Pl.'s 56.1 Stmt.

¶ 53; Defs.' 56.1 Stmt. ¶ 53).  Several weeks earlier, Taro learned from the FDA that CB

Cream was in "first generic drug review," a development which suggested that regulatory

approval of the drug was imminent.  (Pl.'s 56.1 Stmt. ¶ 54; Defs.' 56.1 Stmt.¶ 54).[2]

---

[1](...continued)
Declaration of Amir Rosenthal, dated November 26, 2008;  "R. Defs.' Mem." refers to the
Memorandum of Law of Oren and the Relief Defendants (Docket No. 146); "Pl.'s Reply Mem. I"
refers to the Commission's Reply Memorandum in Further Support of its Motion Against Zvi,
Amir, and Ayal (Docket No. 151); "Pl.'s Reply Mem. II" refers to the Commission's Reply
Memorandum in Further Support of its Motion Against Oren and the Relief Defendants (Docket
No. 152).

[2]    In their Amended Rule 56.1 Statement, Zvi, Amir, and Ayal have denied many of
the Commission's factual assertions "to the extent that those allegations are inconsistent with the
sworn testimony of Zvi . . .  and his allocution" or, alternatively, the "sworn testimony of [Zvi
and Amir] and their respective allocutions."  (See, e.g., Defs.' 56.1 Stmt. ¶ 54).  Oren and the
(continued...)

Subsequently, in the course of asking Amir to transport "some equipment" to Israel which Taro allegedly needed to complete the approval process, Zvi disclosed material nonpublic information to him concerning the pending FDA approval. (Ex. 20). Amir then used that information to trade in Taro securities for his own account, generating profits of $118,798 between May 17 and June 1, 2001. (Ex. 6 at 21, 92; D'Avino Decl. ¶ 2 & Ex. 2).

In July 2004, Zvi disclosed to Amir that Taro would not meet its second-quarter sales projections. (Pl.'s 56.1 Stmt. ¶¶ 22-23 ; Defs.' 56.1 Stmt. ¶¶ 22-23). Knowing that Zvi's disclosure violated his fiduciary duties to Taro, Amir nevertheless

---

[2](...continued)
Relief Defendants have made similar statements in their responses to the Commission's Statement of Undisputed Facts. (See, e.g., R. Defs.' 56.1 Stmt. ¶ 39).

Local Civil Rule 56.1 provides that a statement by a party seeking summary judgment "will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party," followed by a citation to admissible evidence. Local Civil R. 56.1(c), (d) (emphasis added). Here, neither side has furnished the Court with complete transcripts of the guilty pleas and depositions of Zvi and Amir. In any event, even if those materials had been made part of the record, the suggestion that the Court should peruse the full deposition testimony and guilty plea allocutions of Zvi and Amir in an effort to unearth some potential inconsistencies clearly does not satisfy Rule 56(e)(2) of the Federal Rules of Civil Procedure or the local rule. See BellSouth Telecomms., Inc. v. W.R. Grace & Co. - Conn., 77 F.3d 603, 615 (2d Cir. 1996) (party opposing summary judgment must set forth "concrete particulars"); Chenette v. Kenneth Cole Prods., Inc., No. 05 Civ. 4849 (DLC), 2008 WL 3176088, at *5 n.6 (S.D.N.Y. Aug. 6, 2008) (declining to "[scour] the record to develop facts which may be in [the nonmovant's] favor"); FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008) ("[C]onclusory statements that facts listed in . . . Rule 56.1 Statement are 'incorrect,' 'vague,' 'incomplete,' or 'disputed' are not sufficient to put any fact into dispute.").

I nevertheless have reviewed the limited transcript excerpts submitted by the parties. I have been unable to identify any material inconsistencies between the Commission's statement of undisputed facts and the evidentiary record.

4

traded Taro securities in the accounts of his wife Noga Delshad ("Noga"), Noga's father

Bahram Delshad ("Bahram"), Zvi, and an entity known as Aragon Partners LLP

("Aragon"). (Ex. 20). Ayal, Oren, Efrat and Rivka were the limited partners of Aragon;

Amir, in turn, controlled Aragon Capital LLC, Aragon's general partner. (Compl. ¶¶ 17-

18; Pl.'s 56.1 ¶ 14; Defs.' 56.1 ¶ 14). After Amir tipped Heyman about the second-

quarter Taro results, Heyman also traded Taro securities in his own account based on the

insider information. (Pl.'s 56.1 Stmt. ¶¶ 49-50; Defs.' 56.1 Stmt. ¶¶ 49-50). In addition,

in violation of Taro's written policies, Zvi himself sold 10,000 shares of Taro stock from

his personal account in advance of Taro's public disclosure of its second-quarter sales.

(Pl.'s 56.1 Stmt. ¶ 41; Defs.' 56.1 Stmt. ¶ 41; Compl. ¶¶ 27-28; Ex. 2 ¶¶ 11, 12).

By trading ahead of Taro's quarterly earnings announcement, Amir

generated total profits of $962,906 in Aragon's account, $214,946 in Noga's account,

$243,288 in Bahram's account, and $31,143 in Zvi's account. Zvi similarly avoided

losses in the amount of $238,699 through his sales of Taro stock. Finally, by trading

based on Amir's tip, Heyman earned profits and avoided losses in the amount of $83,817.

(D'Avino Decl. Ex. 2).

    C.    <u>Other Insider Transactions</u>

        1.    <u>Ernst & Young</u>

In April 2005, Heyman was employed at Ernst & Young ("E&Y"), where

he was assigned to work on the proposed acquisition of a public company by another

public company that was an E&Y client ("Project AA").  (Pl.'s 56.1 Stmt. ¶ 72; Defs.'

56.1 Stmt. ¶ 72).  In violation of his fiduciary duties to E&Y, Heyman disclosed the

proposed transaction to Amir, who then sold the target company's put options through the

Aragon account.  (Pl.'s 56.1 Stmt. ¶¶ 73, 74; Defs.' 56.1 Stmt. ¶¶ 73, 74; D'Avino Decl.

¶ 2 & Ex. 2).  At the time, Amir was a young associate at the law firm Thacher, Proffitt &

Wood.  Amir passed the tip about Project AA to his law firm supervisor, who also bet on

a rise in the target company's stock by purchasing call options.  (Pl.'s 56.1 Stmt. ¶ 75).

Ultimately, the transaction that Heyman improperly disclosed did not occur.  (Id. ¶ 77;

Defs.' 56.1 Stmt. ¶ 77).  Amir nevertheless generated proceeds in the amount of $78,220

through his sale of the target company's puts.  (D'Avino Decl. Ex. 2).

   2. PriceWaterhouseCoopers

   Ayal is Amir's younger brother.  He completed a bachelor's degree in

management in 2001, a master's degree in accounting in 2002, and all of the course work

for a masters of business administration degree in January 2007.  (Pl.'s 56.1 Stmt. ¶ 12;

Defs.' 56.1 Stmt. ¶ 12).  New York University subsequently declined to grant Ayal the

masters degree, however, after learning that he had pleaded guilty to the conspiracy

charge.  A suit brought by Ayal to challenge that decision is pending in this Court.  See

Rosenthal v. New York University, No. 08 Civ. 5338 (LAK) (S.D.N.Y. filed June 12,

2008).

6

In May 2005, Ayal was employed as an accountant by PriceWaterhouse Coopers ("PwC") which assigned him to work on a proposed corporate merger involving PwC's client as the target ("Project Victor"). During his guilty plea in the criminal case, Ayal admitted that he had provided nonpublic information concerning the proposed merger to Amir, "consciously turn[ing] a blind eye" to the likelihood that Amir would use that information to trade. (Exs. 4 ¶ 26, 6 at 83-84; Compl. ¶¶ 107-09). In fact, after learning of the merger, Amir sold the target company's put options through the Aragon account. Amir also tipped his law firm supervisor, who bought the target company's call options. Amir later liquidated Aragon's position after Ayal tipped him that the merger would not occur. (Compl. ¶¶ 109-11; Ex. 3 ¶ 53; Ex. 4 ¶ 26).

Neither Amir nor Ayal realized any profits in connection with the trades related to Projects AA and Victor. (D'Avino Decl. Ex. 2).

D.    Criminal Case

On February 8, 2007, in the United States District Court for the Eastern District of New York, Zvi, Amir, Ayal, and Heyman each pleaded guilty, before Judge John Gleeson, to a one-count criminal information, which charged that they had conspired, together and with others, to commit securities fraud, in violation of Title 18, United States Code, Section 371. (Ex. 6). During his guilty plea allocution, Amir conceded that he had traded on the basis of material nonpublic information furnished to him by Zvi, knowing that Zvi "was breaching his duty to Taro by giving [him] the

7

information." (Id. at 21).  Amir cited both his trading in advance of the FDA's

announcement about CB Cream in 2001 and his trading before the public disclosure of

Taro's second-quarter sales results in 2004 as examples of his deliberate violations of the

securities law.  Amir also admitted that he tipped others, including Heyman, who had

reciprocated by providing him with nonpublic information acquired at E&Y.  (Id. at 21-

22).

Zvi was the second defendant to plead guilty.  During his allocution, Zvi

explained to Judge Gleeson that, "[b]etween 2001 and 2005," he had "disclosed material,

non-public information concerning Taro to Amir . . . , knowing that with this information

he may trade in Taro securities."  (Id. at 43).  Zvi also acknowledged the correctness of

an overt act in the information which alleged that he had provided Amir with material

nonpublic information about Taro's second-quarter sales results in 2004.  (Id.).

Next, as part of his plea, Heyman admitted that he had traded in Taro

securities based on a tip from Amir, knowing that the information had been obtained from

Zvi, who breached his fiduciary duty to Taro by disclosing the Company's material

nonpublic information to others.  (Id. at 61).  Heyman further conceded, in substance, that

he had provided material nonpublic information to Amir concerning the proposed merger

of two publicly-traded companies, in violation of his "fiduciary duties as an employee of

[E&Y] and [as] a licensed CPA."  (Id.).

Finally, as noted above, Ayal acknowledged during his plea that he had "agreed," in 2005, to tell Amir the names of "two companies that were involved in a confidential acquisition," knowing that Amir was an active securities trader, and therefore consciously turning a "blind eye" to the "obvious" fact that Amir would use the information to execute trades. (Id. at 83-84).[3]

On July 20, 2007, Judge Gleeson sentenced Zvi to sixty months in jail, Amir to thirty-three months in jail, and Ayal to two months in jail.[4] (Exs. 9-11). The Judge also fined Zvi $100,000 and Amir $75,000, and required both sums to be paid by January 20, 2008. (Exs. 9, 10). Ayal was fined $5,000, but Judge Gleeson did not set a deadline for that payment to be made. (Ex. 11). The Judge also did not require any of the defendants to make restitution, after being advised that Zvi, Amir, and Ayal were negotiating a substantial settlement in this case, in which Amir's lawyer predicted there would be "no liability issue," so that the only remaining issues would be "gain and penalty." (Ex. 7 at 6-7; see also Ex. 8 at 5-6 (remarks of Judge Gleeson) (noting counsel's observation that the court should not be concerned about restitution because, "at

---

[3]     Ayal did not admit that he had conspired with Amir to violate the securities laws, but his counsel conceded that conscious avoidance of the aims of a conspiracy is the legal equivalent of knowing participation. (See id. (citing United States v. Svoboda, 347 F.3d 471, 479-80 (2d Cir. 2003))).

[4]     Heyman received a fifteen-month sentence. (Ex. 12). Amir is projected to be released on February 9, 2010, and Zvi on January 27, 2012. (See Federal Bureau of Prisons, Prisoner Locator, http://www.bop.gov/iloc2/LocateInmate.jsp (last visited Nov. 18, 2009).

the very least, [there will] be disgorgement of the fruits of the crime on the SEC side of the proceedings")).

II.    Partial Summary Judgment Motion

Although the Amended Complaint alleges that there were other instances, the Commission's motion for partial summary judgment focuses on the four episodes of insider trading detailed above.  With the exception of Zvi's liability in connection with Amir's trading of Taro securities in advance of the CB Cream announcement in 2001, the Defendants largely concede the issue of liability.  They strenuously object, however, to many of the forms of relief that the Commission seeks.

III.   Discussion

A.     Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment must be

granted. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)

(quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

   In deciding a motion for summary judgment, the court must "view the

evidence in the light most favorable to the party against whom summary judgment is

sought and . . . draw all permissible inferences in favor of that party." <u>Fischl v. Armitage</u>,

128 F.3d 50, 55 (2d Cir. 1997). The court must accept as true the non-moving party's

evidence, if supported by affidavits or other evidentiary material. <u>See</u> <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 252-56 (1986). It follows that "[c]onclusory

allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of

fact." <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998).

   In adjudicating a motion for summary judgment, "[t]he court's function is

not to resolve disputed issues of fact but only to determine whether there is a genuine

issue of material fact to be tried." <u>Fischl</u>, 128 F.3d at 55; <u>see also</u> <u>Anderson</u>, 477 U.S. at

255 ("Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge."). "Only

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248.

Accordingly, "[i]f the evidence is merely colorable . . . or is not significantly probative

. . . summary judgment may be granted." <u>Id.</u> at 249-50 (citing <u>Dombrowski v. Eastland</u>,

387 U.S. 82, 87 (1967); <u>Cities Serv. Co.</u>, 391 U.S. at 290); <u>see also</u> <u>Niagara Mohawk</u>

Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (the "'mere existence

of a scintilla of evidence' . . . is . . . insufficient to defeat summary judgment") (quoting

Anderson, 477 U.S. at 252).

        The summary judgment analysis is not altered by the fact that the plaintiff in

this case is the Commission.  See SEC v. Research Automation Corp., 585 F.2d 31, 33-34

(2d Cir. 1978).  Nor does the fact that the Commission seeks injunctive relief as part of its

requested remedy change the analysis.  Id.  To the extent that the Court is asked to weigh

questions of materiality, summary judgment may be granted only if "the omissions and

misrepresentations in question are 'so obviously important to the investor[] that

reasonable minds cannot differ on the question of materiality.'"  SEC v. Credit Bancorp,

Ltd., 195 F. Supp. 2d 475, 492 (S.D.N.Y. 2002) (quoting Research Automation Corp.,

585 F.2d at 35).

        Zvi, Amir, and Ayal are not represented by counsel in this proceeding.

They nevertheless have submitted extensive papers prepared by Amir, who practiced law

prior to his conviction and subsequent disbarment.  (See Ex. 24 ("Amir Dep.") at 99-101;

In re Rosenthal, 880 N.Y.S.2d 603 (N.Y. App. Div. 2009)).  Despite the considerable

legal skill reflected in the papers that Amir has prepared, he no longer is an attorney.

Consequently, he and the others who rely on his papers to oppose the Commission's

motion are entitled to "special latitude."  See Bunkley-Claybrooks v. Shelly's of New

York, No. 07 Civ. 7727(JGK), 2009 WL 2486046, at *2 (S.D.N.Y. August 14, 2009); see

also Estelle v. Gamble, 429 U.S. 97, 106 (1976) (pro se complaint should be held to a "less stringent standard[] than formal pleadings drafted by lawyers"); McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (pleadings should be read liberally and interpreted to "raise the strongest arguments that they suggest") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).  It nevertheless is settled law that "a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Odom v. Keane, No. 95 Civ. 9941 (SS), 1997 WL 576088, at *3 (S.D.N.Y. Sept. 17, 1997) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1995)).

      B.     Substantive Law

      The Commission alleges that Amir, Ayal, and Zvi have violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder in connection with their insider trading scheme.

      Section 17(a) of the Securities Act states that:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light

13

> of the circumstances under which they were made, not
> misleading; or
>
> **(3)** to engage in any transaction, practice, or course of business which
> operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Section 10(b) of the Exchange Act makes it illegal for "any person . . . [t]o

use or employ, in connection with the purchase or sale . . . any manipulative or deceptive

device or contrivance" in violation of the rules and regulations prescribed by the

Commission.  15 U.S.C. § 78j(b).

> Rule 10b-5, promulgated thereunder, provides that:
>
> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any national
> securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit
> to state a material fact necessary in order to make the
> statements made, in the light of the circumstances under
> which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any
> person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The elements required to establish violations of Sections 10(b) and 17(a)

are "essentially the same."  <u>SEC v. Monarch Funding</u>, 192 F.3d 295, 308 (2d Cir. 1999).

Thus, to be liable for securities fraud under either statute, a defendant must have "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." Id. In this action, because the Commission is the plaintiff, it need not prove loss causation, reliance, or damages in order to prevail on its claims. Credit Bancorp, 195 F. Supp. 2d at 490-91.

There are two established theories of insider trading: the "classical theory" and the "misappropriation theory." United States v. O'Hagan, 521 U.S. 642, 652-53 (1997). "The classical theory targets a corporate insider's breach of duty to the shareholders with whom the insider transacts; the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information." Id. Under the classical theory, an insider also is liable if he tips others with the intent that they will trade based on the nonpublic information. Dirks v. SEC, 463 U.S. 646, 659 (1983). A tippee also assumes a fiduciary duty not to trade based on insider information when the "insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." Id. at 660.

"In determining whether the insider's purpose in making a particular disclosure is fraudulent, the SEC and the courts are not required to read the parties' minds." Id. at 663. Rather, they may focus on "objective criteria," such as a "relationship

between the insider and the recipient [of the nonpublic information] that suggests a <u>quid</u> <u>pro</u> <u>quo</u> from the latter or an intention to benefit the particular recipient." <u>Id.</u> at 664. A close personal relationship between the tipper and a tippee who trades suffices because the "tip and trade resemble trading by the insider himself followed by a gift of the profits to the [tippee]." <u>Id.</u>; <u>accord</u> <u>SEC v. Warde</u>, 151 F.3d 42, 48-49 (2d Cir. 1998); <u>but see</u> <u>SEC v. Palermo</u>, 99 Civ. 10067 (AGS), 2001 WL 1160612, at *7 (S.D.N.Y. Oct. 2, 2001) (denying summary judgment although tipper and tippee were friends because conveyance of material nonpublic information and other elements of claim were not conceded).

    C.    <u>Application of Law to Facts</u>

        1.    <u>CB Cream</u>

        The only area in which any of the Defendants disputes the SEC's ability to prove its securities fraud claims relates to Amir's trading in Taro securities shortly before the FDA announced its approval of CB Cream in May 2001. In essence, Zvi argues that he did not act fraudulently because he had a legitimate reason to make his disclosure to Amir – namely, to ensure that Amir would be able to fly to Israel on short notice to deliver certain equipment that Taro needed in order to secure the FDA's approval. (Defs.' Mem. at 37-38). Zvi also contends that his guilty plea allocution contains no admission of wrongdoing with respect to his conversation with Amir in 2001. (<u>Id.</u> at 38). Ironically, during his own guilty plea allocution, Zvi's tippee – his son Amir – conceded that he knew his father was breaching his fiduciary duty to Taro by disclosing the

information, that his father intended for him to "profit on the information," and that his

trading therefore was unlawful.  (Ex. 6 at 21).

The SEC contends that Amir's statements during his guilty plea are

admissible against Zvi under Rule 803(22) of the Federal Rules of Evidence.  That rule,

insofar as relevant, provides that the hearsay rule does not preclude the use of evidence of

a "final judgment, entered after a trial or upon a plea of guilty . . . [to a felony], to prove

any fact essential to sustain the judgment."  Fed. R. Evid. 803(22).  "What issues were

decided in the criminal case is a question of law that 'must be determined by the trial

judge . . . upon an examination of the record, including the pleadings.'"  New York v.

Hendrickson Bros., Inc., 840 F.2d 1065, 1081 (2d Cir. 1988) (quoting Emich Motors

Corp. v. Gen. Motors Corp., 340 U.S. 558, 569 (1951)).  "A plea of guilty is an admission

of all the elements of a formal criminal charge, and is itself a conviction as conclusive as

a jury verdict."  In re Gaming Lottery Sec. Litig., No. 96 Civ. 5567 RPP, 2001 WL

204219 at, *13 (S.D.N.Y. March 1, 2001) (citing La Magna v. United States, 646 F.2d

775, 778 (2d Cir. 1981)).

Here, the defendants in the Eastern District criminal case each were charged

with conspiring to violate the securities laws, in violation of Title 18, United States Code,

Section 371.[5]  The elements of that crime are that:  (a) the conspiracy charged existed; (b)

---

[5]      The criminal information filed in the Eastern District of New York was not
furnished to me by the parties, but is publicly available on PACER.  Accordingly, I can consider
its contents in connection with the SEC's motion.  See Fed. R. Evid. 201(b)  (court may take

(continued...)

the defendant under consideration joined it knowing its unlawful purpose (or consciously avoided such knowledge); and (c) at least one overt act in furtherance of the conspiracy took place in the Eastern District of New York.[6]  See United States v. Santos, 541 F.3d 63, 70-71 & n.7 (2d Cir. 2008); Svoboda, 347 F.3d at 476, 482-83.  The essence of the crime is, of course, the existence of an unlawful agreement.  Svoboda, 347 F.3d at 476-77.

Noticeably absent from the elements of the crime of conspiracy is any requirement that the conspirators have achieved their unlawful objective.  See United States v. Feola, 420 U.S. 671, 694 (1975); United States v. Frank, 520 F.2d 1287, 1290-91 (2d Cir. 1975).  Accordingly, because the actual transmission of material public information is not an element of an insider trading conspiracy, and therefore not essential to a judgment of conviction, Amir's admission that he knew his father was violating his fiduciary duties to Taro by leaking information in advance of the CB Cream announcement is not admissible against Zvi under Rule 803(22).   It follows that the Commission is not entitled to partial summary judgment against Zvi with respect to the 2001 trading on the theory that Zvi is bound by Amir's concession that Zvi acted knowingly and with the intent that Amir use the information to trade.  On the other hand,

---

[5](...continued)
judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

[6]      Venue need only be proven by a preponderance of the evidence.  United States v. Bala, 236 F.3d 87, 95 (2d Cir. 2000).

during his own guilty plea, Amir unquestionably admitted that he traded in advance of the CB Cream announcement on the basis of material nonpublic information, knowing that it had been disclosed to him by Zvi in violation of Zvi's fiduciary duty to Taro. The Commission therefore has established that Amir is liable under Section 10(b) and Rule 10b-5 in connection with the 2001 trades.[7]

       2.      2004 Quarterly Earnings

Whatever evidentiary deficiencies may exist with respect to Zvi's liability for the trading in 2001 do not extend to the trading in mid-2004. Indeed, during his guilty plea allocution, Zvi unambiguously stated that he disclosed material nonpublic information about Taro's second-quarter sales performance to Amir in 2004, knowing that Amir would use that information to trade. (See Ex. 6 at 43). Amir similarly admitted during his own guilty plea that he used his father's tip not only to trade, but to tip Heyman. (Id. at 21; Defs.' 56.1 Stmt. ¶ 50). It further is undisputed that Zvi sold 10,000 shares of Taro stock through his own account after learning of Taro's disappointing second-quarter performance, but before Taro made any public disclosure of its earnings. (Defs.' 56.1 Stmt. ¶¶ 41, 43). These facts suffice to establish that both Zvi and Amir violated Sections 10(b) and 17(a) and Rule 10b-5 in connection with their second-quarter 2004 Taro trades.

---

      [7]     As the Commission concedes, Amir's trading in Taro securities ahead of the FDA announcement did not involve the "offer" or "sale" of securities and therefore did not violate Section 17(a). (Pl.'s Mem. at 5).

3.     PwC

While he was employed at PwC, Ayal received manuals that "emphasized the inappropriateness of insider trading."  (Ex. 32 at 40).   As part of his guilty plea allocution, Ayal admitted that, despite these warnings, he gave Amir nonpublic information about a "confidential acquisition that [he] was working on" at PwC, and "turned a blind eye" to the fact that his brother would likely violate the securities laws by using that information to trade.  (Ex. 6 at 84; Pl.'s 56.1 Stmt. ¶¶ 61-63; Defs.' 56.1 Stmt. ¶¶ 61-63).  Amir in fact sold the target company's put options through the Aragon account based on that material nonpublic information.  (Pl.'s 56.1 Stmt. ¶63; Defs.' 56.1 Stmt. ¶ 63).  Amir also tipped his law firm supervisor, who bought the target company's call options.  (Pl.'s 56.1 Stmt. ¶¶ 64-65; Defs.' 56.1 Stmt. ¶¶ 64-65; Compl. ¶ 109; Ex. 3 ¶ 53).  Amir later unwound Aragon's positions after learning through a second tip from Ayal that the proposed merger was not going to occur.  (Compl. ¶111; Ex. 3 ¶ 53).

Although Ayal expressly denies that he acted intentionally, a showing of reckless behavior is sufficient in this Circuit to establish civil liability on the part of an alleged securities law violator.  See Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 144 (2d Cir. 1991) ("For Rule 10(b)(5) [sic] purposes, scienter includes recklessness."); SEC v. Solucorp Inds., Ltd., 274 F. Supp. 2d 379, 418-19 (S.D.N.Y. 2003) (scienter element under Sections 10(b) and 17(a)(1) "may be satisfied by proof of reckless conduct"); see also In re Amaranth Sec. Litig., 587 F. Supp. 2d 513, 529 n.97 (S.D.N.Y.

20

2008) ("Second Circuit law, which permits scienter to be shown by recklessness, continues to bind this Court" in Section 10(b) cases because the Supreme Court has expressly declined to reach the issue). Accordingly, inasmuch as Ayal concedes that he acted at least recklessly, the SEC is entitled to summary judgment on its Section 10(b), Section 17(a), and Rule 10b-5 claims with respect to the Project Victor-related trades executed by Amir and his law firm supervisor on the basis of Ayal's tips.

4.    E&Y

After Amir tipped Heyman about Taro's anticipated earnings announcement in the second quarter of 2004, Heyman returned the favor in early 2005 by tipping Amir about Project Victor – the possible acquisition of one public company by another public company – which was nonpublic information that Heyman had acquired in the course of his employment at E&Y and knew to be confidential. (Pl.'s 56.1 Stmt. ¶¶ 72-73; Defs.' 56.1 Stmt. ¶¶ 72-73). It also is undisputed that Amir either knew or was reckless in not knowing that Heyman's tip consisted of material nonpublic information that had been misappropriated from E&Y or, at a minimum, was being disclosed in violation of Heyman's fiduciary duty to E&Y and its clients. (Compl. ¶ 148; Ex. 3 ¶ 54). Amir nevertheless sold the target company's put options through the Aragon account and passed the inside information to his law firm supervisor, who bought the target company's call options. (Pl.'s 56.1 Stmt. ¶¶ 74-75; Defs.' 56.1 Stmt. ¶¶ 74-75). Amir's

21

actions as both a tipper and a tippee therefore clearly establish that he violated Sections 10(b) and 17(a) and Rule 10b-5 in connection with Project Victor.

IV.    SEC's Proposed Relief

   The SEC requests several forms of relief as a consequence of the conduct admitted by Zvi, Amir, and Ayal.  First, the SEC seeks a permanent injunction against further securities laws violations by these defendants.  (Pl.'s Mem. at 16-19).  Second, the SEC seeks an order requiring the Defendants to disgorge the amounts that they obtained through the unlawful trading and to pay prejudgment interest thereon.  (Id. at 20-27). Third, the SEC asks that the Court impose civil penalties on Zvi, Amir, and Ayal.  (Id. at 27-32).  Fourth, the SEC requests that Zvi be permanently barred from serving as an officer or director of a public company.  (Id. at 33-34).  Finally, the SEC asks the Court to enter final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure with respect to the claims established by the guilty pleas of Zvi, Amir, Ayal, and Heyman.  (Id. at 34-37).

   As noted above, the Defendants do not dispute much of the Commission's liability case.  They nevertheless object to virtually all of the relief that the Commission seeks as part of its motion.  I therefore turn to each form of relief requested by the Commission and the objections thereto.

A.     <u>Injunction</u>

The Securities Act and the Exchange Act both authorize the issuance of a temporary or permanent injunction in a suit by the Commission without the posting of a bond if a person is "engaged or about to engage in any acts or practices" that violate the Act.  15 U.S.C. §§ 77t(b), 78u(d)(1).  To obtain an injunction, the Commission thus "must demonstrate that there is a substantial likelihood of future violations of illegal securities conduct."  <u>SEC v. Cavanagh</u>, 155 F.3d 129, 135 (2d Cir. 1998).  In deciding whether to issue an injunction, and if so its scope, a court may examine the level of the defendant's culpability, and whether the violations were systematic or isolated occurrences, whether the defendant has accepted responsibility, and whether, because of his occupation, the defendant might have an enhanced opportunity to commit further securities law violations.  <u>Id.</u>; <u>see also</u> <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1477 (2d Cir. 1996) ("[A]n injunction is particularly within the court's discretion where a violation was 'founded on systematic wrongdoing.'") (quoting <u>United States v. Carson</u>, 52 F.3d 1173, 1184 (2d Cir. 1996)).

Zvi and Amir do not dispute that their conduct was sufficiently egregious and repetitive to warrant permanently enjoining them from future violations of the securities law.  (Defs.' Mem. at 17).  Accordingly, the permanent injunction requested by the SEC with respect to Zvi and Amir will be granted.  Ayal argues, however, that the SEC is not entitled to injunctive relief against him because his misconduct was limited to

an "isolated incident and it is highly improbable that he will engage in future violations of the securities laws." (Id.).

In its papers, the SEC advances six arguments in support of its application for an injunction against future violations by Ayal. (Pl.'s Mem. at 17-18). First, the SEC contends that Ayal's conduct involved a "high degree[] of scienter." (Id. at 17). Second, the SEC asserts that Ayal lied about material facts because he stated in a letter to the Court dated February 5, 2008, that he "knew 'for a fact that Amir did not have access to [one of his securities accounts],'" yet testified during his subsequent deposition "that Amir did have access to the account." (Pl.'s 56.1 Stmt. ¶ 91). Third, the SEC alleges that Ayal misrepresented his securities experience on "at least one" of his brokerage account applications. (Id. ¶ 92). Fourth, the SEC contends that Ayal minimized his criminal culpability in the suit that he brought against New York University in an effort to compel that institution to grant him an MBA degree. (Id. ¶¶ 93-94).[8] Fifth, the SEC argues that, as an accountant, Ayal is "likely to have access to material nonpublic information in the future." (Pl.'s Mem. at 18). Finally, the SEC alleges that the risk of future violations is a

---

[8]    Zvi, Amir, and Ayal object to paragraphs 82 through 92 of the Commission's Statement of Undisputed Facts on the ground that they allegedly constitute "an impermissible attempt to introduce inadmissible character evidence." (Defs.' 56.1 Stmt. ¶ 91). Character evidence is, of course, inadmissible if proffered to show that a person acted "in conformity therewith." Fed. R. Evid. 404(b). Such evidence nevertheless may be offered "for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id.

concern because Ayal has been trading securities for approximately eight years and continues to trade mutual funds.  (Id.).

Although Ayal benefitted from the misconduct of Zvi and Amir through his ownership interest in Aragon, the specific conduct that he has admitted – two reckless tips to his brother Amir about a proposed acquisition and its later abandonment – pales in comparison to their unlawful activities.  Assuming that Ayal's actions were, in fact, not intentional, as I must at this juncture, it also appears that he has accepted responsibility for his actions.  The SEC disputes this, noting that Ayal has filed a suit seeking to compel NYU to grant him an MBA degree notwithstanding his criminal conviction.  (Pl.'s Mem. at 19).  Having reviewed the complaint in that case, which was, in any event, drafted by Ayal's counsel, I do not agree that Ayal improperly attempted to minimize his own involvement in the insider trading scheme.  Indeed, the complaint quotes the material portion of Ayal's guilty plea allocution.  (See Ex. 33).

The key question is not Ayal's acceptance of responsibility, but the likelihood that he will commit future securities law violations.  In that regard, the SEC is correct that Ayal has not formally foresworn future securities law violations in his opposition papers.  (See Pl.'s Reply Mem. I at 6).  He is, however, a pro se litigant, who may well not have realized that such a statement could bolster his position.  I also am not persuaded that Ayal should be distrusted simply because he conceded during a prior court conference that it would be very difficult for him to oppose a partial summary judgment

motion seeking injunctive relief based on Project Victor.  (See id. at 5) (contending that Ayal "reneged" on his "pledge not to contest the Commission's request for an injunction against him").

Far more troubling is the fact that Ayal is – and remains – an accountant. The SEC maintains that by virtue of that credential, Ayal is "likely to have access to material nonpublic information in the future."  (Pl.'s Mem. at 18).  The SEC further alleges in its Amended Complaint that Ayal is a licensed certified public accountant. (Compl. ¶ 11).  However, Ayal has specifically denied this allegation, (Ex. 4 at ¶ 3), and the SEC has not provided the Court with any evidence that his denial lacks a factual basis. Ayal also apparently is not working as an accountant at present.  Although an accountant certainly could become privy to material nonpublic information concerning a publicly-traded company during the course of his work, this possibility seems more remote if, as appears to be the case here, the accountant is not a certified public accountant.

Furthermore, while Ayal evidently continues to trade securities for his own account, there has been no showing that this materially increases the likelihood that he will recidivate.  By definition, someone who trades on nonpublic information needs an inside source.  Here, unless Ayal secures future work as an accountant, he is unlikely to be able to repeat the misconduct that led to his guilty plea.

For these reasons, the SEC's application to enjoin Ayal from future securities law violations is denied.  The SEC will, however, be permitted to renew its

26

application at a later date if it believes that a fuller record warrants reconsideration of this issue.

      B.    <u>Disgorgement</u>

      The SEC seeks disgorgement from several sources.  First, the SEC seeks to recover $1,774,798 in profits from Zvi.  (D'Avino Decl. Ex. 2).  This sum consists of profits in the amount of $962,906 that Amir generated through his trading in advance of Taro's second-quarter 2004 earnings announcement, plus profits for Noga in the amount of $214,946, for Bahram in the amount of $243,288, for Heyman in the amount of $83,817, and for Zvi himself in the amount of $269,841.  (<u>Id.</u>).  Second, the SEC seeks disgorgement from Amir in the amount of $1,536,099, which consists of all of the foregoing profits other than the $238,699 that Zvi netted through his own trading of Taro stock in advance of Taro's second-quarter 2004 earnings announcement.[9]  (<u>Id.</u>).  Finally, the SEC notes that, in May 2006, after the Aragon account had earned profits in the amount of $962,906 as a result of Amir's illegal insider trades in advance of Taro's second-quarter 2004 earnings announcement, Amir caused Aragon to make separate $500,000 cash distributions to Ayal, Oren, Efrat, Rivka, and himself.[10]  (Pl.'s Mem. at

---

[9]    This profit calculation does not include an additional $4,000 in cash that Heyman gave to Amir in return for his tip about Taro's earnings.  (<u>See</u> Pl.'s 56.1 Stmt. ¶ 51).

[10]    The SEC alleges that Amir was aware of the criminal investigation prior to making these distributions.  (<u>See</u> Pl.'s 56.1 Stmt. ¶17).  In his counter-statement of facts, Amir alleges that he continued trading the Aragon account even after learning of the criminal investigation.  (Defs.' 56.1 Stmt. at 4 ¶ 16).  Assuming that this is true, it by no means suggests

(continued...)

20-21).  The SEC therefore seeks to recover one-fifth of Aragon's ill-gotten gains

($192,581) from each of the five defendants who received a distribution.  (Id. at 26).

   Prior to the realization of any profits in the Aragon account resulting from

insider trades in June or July 2004, the "total account value" of that account was

$1,636,431.  (R. Defs.' 56.1 Stmt. ¶ 9).  Furthermore, prior to the execution of the insider

trades, Oren had made capital contributions to the Aragon account of at least $1,312,000,

Efrat had made capital contributions totaling $631,000, and Ayal had made a capital

contribution of $201,000.  (Defs.' 56.1 Stmt. at 3 ¶ 15; R. Defs.' 56.1 Stmt. at 25-26 ¶¶ 2-

5).[11]

   The Defendants advance a number of reasons why disgorgement based on

the Aragon trading either should not be required or should be limited to lesser amounts.

Zvi and Amir argue that the amounts to be disgorged should be reduced by the taxes that

they paid, and that they should not be jointly and severally liable for Heyman's financial

obligations.  (Defs.' Mem. at 33-36).  In addition, Oren and the Relief Defendants

maintain that there is no statutory authority to seek disgorgement from them, that the

Amended Complaint in this action contains no claim for relief which would permit that

remedy, and that there are, in any event, material factual issues that preclude an award of

---

[10](...continued)
that Amir was unaware of the Government's investigation when he made the cash distributions.

  [11]  For purposes of the present partial summary judgment motion, the Commission
does not dispute any of the additional facts set forth in the Defendants' counter-statements of
material undisputed facts.  (See Pl.'s Reply Mem. I at 2; Pl.'s Reply Mem. II at 2).

partial summary judgment against them at this juncture. (See R. Defs.' Mem. at 1). None of these contentions withstands scrutiny.

      1.    Setoff for Taxes

      Relying on cases which stand for the proposition that disgorgement should not be a punitive remedy, Zvi and Amir maintain that any required disgorgement should be limited to their net profits, not their gross revenues, and that they (and presumably their codefendants) consequently should receive a credit for the capital gains taxes that they paid. (See Defs.' Mem. at 33-34) (citing SEC v. First City Fin. Corp., 890 F.2d 1215, 1234 (D.C. Cir. 1989), and SEC v. Grossman, No. 87 Civ. 1031 (SWK),1997 WL 231167, at *9 (S.D.N.Y. May 6, 1997)). Zvi and Amir further pledge not to seek a refund if this reduction is made. (Id. at 34 n.28). However, they have not cited a single securities case in which such an offset was granted. They also have failed to produce any tax returns or other documents which would establish that they, in fact, paid the capital gains taxes or the amounts that they paid. They also have not shown that they are unable to recover any overpayments through future tax filings. For these reasons, and because the amount that a court orders to be disgorged need not be exact, I decline to grant the Defendants any credit for any capital gains taxes that they may have paid. See SEC v. Koenig, 532 F. Supp. 2d 987, 994 (N.D. Ill. 2007) (rejecting similar request); SEC v. Svoboda, 409 F. Supp. 2d 331, 345 (S.D.N.Y. 2006) (same).

2.     Joint and Several Liability

In January 2008, Heyman settled with the Commission pursuant to a stipulated Final Judgment which provided that he and a related partnership were liable to disgorge profits in the amount of $238,077, plus prejudgment interest in the amount of $40,556, or a total of $278,633.  The Final Judgment further provided, however, that the Court would forego the imposition of a civil penalty and require the payment of only $47,000 in light of Heyman's weak financial condition.  (Ex. 14).  Heyman also was enjoined from committing any further securities law violations.  (Id.).

Zvi and Amir contend that they should not be held liable for the $231,633 in disgorgement and prejudgment interest that Heyman failed to pay because the SEC waived its right to recover that sum by settling with Heyman for a lesser amount.  (Defs.' Mem. at 35-36).  In support of this argument, Zvi and Amir cite McDermott, Inc. v. Amclyde, 511 U.S. 202 (1994), an admiralty case, in which the Supreme Court held that the policy arguments in favor of the pro tanto rule, pursuant to which jointly and severally liable non-settling defendants receive a credit solely for the amount of their settling codefendants' payments, were outweighed by those favoring the non-settling defendants receiving a credit for the settling defendants' proportionate share of liability.  Id. at 216-17.  The McDermott rule has since been applied to securities fraud cases.  See, e.g., In re Del-Val Fin. Corp. Sec. Litig., 874 F. Supp. 81, 82 (S.D.N.Y. 1995).

30

The Commission responds that "Heyman did not settle for less than his full liability because he was capitalizing on an attractive settlement offer; he settled for less than the full amount because he had no means to pay any more than that." (Pl.'s Reply Mem. I at 13 (citing Ex. 14 ¶¶ 3, 4)). The Commission further reasons that even if Heyman had proceeded to trial and lost, it still could "look to Zvi and Amir for that portion of the judgment it could not collect." (Pl.'s Reply Mem. I at 14). In that regard, it is significant that the settlement reflected in the Final Judgment regarding Heyman contains no order barring contribution claims. (See Ex. 14). Accordingly, if Heyman paid less than what is ultimately determined to be his proportionate share, Zvi and Amir will be able to sue him for contribution. The Commission maintains that the "risk of collection . . . should be theirs, not the Commission's. (Pl.'s Reply Mem. I at 14 n.12).

The difficulty with the Commission's argument is that it assumes that Heyman could pay only $47,000. While the Final Judgment recites that Heyman submitted a Statement of Financial Condition, dated as of August 21, 2007, which formed the basis for the Commission's decision not to seek further sums from him, it does not appear that Zvi and Amir have been afforded an opportunity to test Heyman's representations regarding his ability to pay. For this reason, the Court will deny the Commission's application to require Zvi and Amir to disgorge a sum equal to Heyman's remaining liability, but does so without prejudice to a renewed application for the same relief at a later stage of this suit.

31

3.    SEC Statutory Authority

Oren and the Relief Defendants argue that the Commission's effort to recover funds from them is not authorized by statute.  In its Amended Complaint, the Commission alleges in that regard that it is authorized to bring this action under three statutes:  (a) Section 20(b) of the Securities Act, 17 U.S.C. § 77(b) (which authorizes the filing of an action to enjoin "acts or practices" that "constitute or will constitute" a violation of the Securities Act or the Exchange Act); (b) Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d) (which contains almost identical language); and (c) Section 21A of the Exchange Act, 15 U.S.C. § 78u-1 (which authorizes the filing of an action against someone who engages in illegal insider trading).  (Compl. ¶ 6).  As Oren and the Relief Defendants correctly note, Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5), also permits the Commission to seek equitable relief "for the benefit of investors" if it is authorized to bring an action under Section 20(b) of the Securities Act or Section 21(d)(1) of the Exchange Act.  (R. Defs.' Mem. at 7).

Reasoning that they are not alleged to have violated any securities laws in connection with their dealings with Aragon, Oren and the Relief Defendants maintain that there is no statutory justification for requiring them to disgorge any portion of the $500,000 distributions that they received.  (R. Defs.' Mem. at 7-11).  What these defendants overlook is that once jurisdiction over the subject matter of a suit brought by the Commission is established, the Court itself has the equitable power to order relief

32

against someone who is not alleged to be a securities law violator if he "has received ill-gotten funds" and "does not have a legitimate claim to those funds." <u>SEC v. Cavanagh</u>, 155 F.3d at 136; <u>see also</u> <u>SEC v. Cherif</u>, 933 F.2d 403, 414 (7th Cir. 1991) ("nominal defendant" may be "joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because he has no ownership interest in the property which is the subject of the litigation"); <u>SEC v. The Better Life Club of Am., Inc.</u>, 995 F. Supp. 167, 181 (D.D.C. 1998) ("Federal courts are empowered to exercise jurisdiction over securities claims against non-violators when necessary to ensure a complete remedy.").

Oren and the Relief Defendants argue that these decisions are not controlling because they do not "directly address" whether the Commission is authorized by statute "to bring a claim for relief against a person who has <u>not</u> violated the federal securities laws in which the SEC demands an order holding such non-violator 'liable' for payment of monies." (R. Defs.' Mem. at 8-9) (emphasis in original). There is no need for such authority, however, because the case law makes clear that the Court itself, in appropriate circumstances, has that inherent authority.

Oren and the Relief Defendants also suggest that the prior decisions requiring disgorgement by "nominal" or "relief" defendants are inapposite because none of them "involve an attempt by the SEC to, in effect, seize a distribution of funds that occurred nearly two years after the alleged insider trading occurred in an account that was not owned by the non-violator." (<u>Id.</u> at 10). While this may be true, it is scarcely

dispositive.  In <u>Cavanagh</u> for example, the SEC sought to recover the proceeds of a

scheme to defraud investors through the sale or attempted sale of unregistered shares of a

public company on the basis of misrepresentations.  <u>Cavanagh</u>, 155 F.3d at 132.  The lead

defendant, an investment banker, had distributed "hundreds of thousands" of the public

company's shares to his friends and relatives, among others, "often without

consideration."  <u>Id.</u>  One recipient of this largesse, from whom the SEC sought

disgorgement, previously had directed that his shares be deposited into his wife's account.

<u>Id.</u>  Thereafter, those shares were sold, generating $500,000 in proceeds which were

transferred to the wife's individual bank account without her knowledge.  <u>Id.</u> at 137.

Rejecting the wife's efforts to retain these funds, the Second Circuit observed that

allowing her to do so would enable "almost any defendant to circumvent the SEC's power

to recapture fraud proceeds, by the simple procedure of giving stock to friends and

relatives without their knowledge."  <u>Id.</u>

   The transfers from Aragon to Oren and the Relief Defendants that Amir

engineered in this case served the same purposes as the transfers in <u>Cavanagh</u>, which was

to shield the proceeds of securities law violations from disgorgement.  Although there

may not be any case directly holding that disgorgement is proper when the funds at issue

are held in the name of an entity, such as a limited liability partnership, which is not itself

accused of any wrongdoing, there also is no authority indicating that any award of

equitable relief in such circumstances is unlawful.  I therefore reject the contention that

the Securities Act or the Exchange Act bars this Court from requiring disgorgement of the proceeds of Amir's illegal insider trades simply because those funds are now held by a "relief" defendant.

    4.    <u>Lack of a Specific Claim for Relief</u>

Oren and the Relief Defendants further contend that the SEC is not entitled to disgorgement because they have not been named in any claims in the Amended Complaint.  They also maintain that the failure to name them in a claim for relief is "inconsistent with [the SEC's] own practice in other insider trading cases involving relief defendants."  (R. Defs.' Mem. at 13-14) (citing cases).  Finally, they complain that the absence of a specific claim impedes their ability to determine the applicable law, suggesting, by way of example, that the law governing unjust enrichment claims in New York and New Jersey is inconsistent.[12]  (<u>Id.</u> at 14).

A party generally is not entitled to summary judgment on a claim that it has failed to include in its pleadings.  <u>See</u> <u>Free v. Bland</u>, 369 U.S. 663, 670-71 (1962) (court below could not properly have decided issue of fraud on summary judgment in the absence of any "direct allegation of fraud in the counterclaim").  Accordingly, if the Commission were seeking to bring a claim against Owen and the Relief Defendants, such as an unjust enrichment claim, they would be entitled to have that claim separately

---

[12]    Although they do not indicate why New Jersey law might apply to this case, I note that Aragon's brokerage account statements indicate that the company operated out of the Rosenthal family residence in Tenafly, New Jersey.  (<u>See</u> D'Avino Decl. Ex. 5).

delineated in the Commission's Amended Complaint.  See Fed. R. Civ. P. 8(a)(2)

(pleading shall contain "a short and plain statement of the claim showing that the pleader

is entitled to relief"); see also Robbin v. Banner Inds., 285 F. Supp. 758, 760 (S.D.N.Y.

1966) (notice pleading requires "averment of a single set of facts" accompanied by

"separate counts" setting forth the pleader's legal theories for recovery).  Here, however,

the Relief Defendants are joined solely because they were limited partners in Aragon,

which distributed the proceeds of Amir's illegal trading to them in approximately May

2005.  (Compl. ¶¶ 20-21; see id. at 51 (prayer for relief)).  There is no claim that the

Commission could assert against Oren and the Relief Defendants with respect to the

Aragon second-quarter Taro trades.  Rather, the Commission simply contends that other

defendants are liable under the securities laws for executing those trades on the basis of

material nonpublic information.  Moreover, although the Amended Complaint accuses

Oren of specific acts of wrongdoing, for purposes of the Commission's motion for partial

summary judgment, Oren is not alleged to have engaged in any impropriety, and therefore

stands in the shoes of the Relief Defendants.

There consequently is no need for the SEC to bring a "claim" in order for

the Court to reach the assets of Oren and the Relief Defendants.  Rather, as the case law

with respect to "nominal" or "relief" defendants makes clear, a third party who has no

legitimate claim to the proceeds of a securities law violation can be required to disgorge

those ill-gotten gains to the Commission.  See, e.g., Cavanagh, 155 F.3d at 136.

36

5.    Alleged Factual Issues

The last argument advanced by Oren and the Relief Defendants is that the

SEC has failed to show through uncontradicted evidence that they (a) "received ill-gotten

funds" from Aragon in May 2006, and (b) do not have "a legitimate claim" to those

funds."  (R. Defs.' Mem. at 16-20).

As noted earlier, the trading records produced by the SEC confirm that the

trades that Amir executed in the Aragon account on the basis of Zvi's improper tip

regarding Taro's second-quarter 2004 earnings performance yielded profits of $962,906.

(Pl.'s 56.1 Stmt. ¶ 48; Defs.' 56.1 Stmt. ¶ 48; D'Avino Decl. ¶ 2 & Ex. 2).  Accordingly,

unless Oren and the Relief Defendants are able to demonstrate some basis to claim

legitimate ownership of these funds, the Commission is entitled to their disgorgement as a

matter of law.

The parties' papers do not disclose the state in which the Aragon limited

partnership was formed.  Nevertheless, regardless of which state's law may apply, it

seems clear that Amir's decision to execute his insider trades through such a vehicle was

intended to ensure that the limited partners would not be vicariously liable for Aragon's

debts.  (See Amir Dep at 220 ("[P]robably the most important reason was liability.  When

you have a limited partnership, the limited partners can only lose what they put in.").

Indeed, that is one of the key advantages of operating as a limited liability partnership.

See generally, 6 Del. C. § 15-306(c); N.J. Stat. Ann. § 42:1A-18(c); N.Y. Partnership Law

§ 26(2)(b); Alan R. Bromberg & Larry E. Ribstein, <u>Limited Liability Partnerships, the</u> <u>Revised Uniform Partnership Act, and the Uniform Limited Partnership Act</u> § 3.04, at 123 (2005 ed.).

By choosing to operate Aragon as a limited partnership, Amir created a situation in which any funds paid into the partnership by the limited partners would ordinarily be constituted equity contributions, not loans.  <u>See, e.g.</u>, <u>The Commons at</u> <u>Lebanon v. Oakview Sec. Corp.</u>, No 91 Civ. 4189, 1993 WL 515838, at *11-12 (D.N.J. Dec. 8, 1993) (quoting Reed Rowley & David Sive, Rowley on Partnership § 53.2, at 558 (2d ed. 1960)) ("To be 'contributed' to the limited partnership, the beneficial interest in the cash or other property must be conveyed, transferred or assigned unconditionally.") (emphasis omitted); <u>Kittredge v. Langley</u>, 252 N.Y. 405, 419 (1930) (Contribution of a special partner, "like the capital of a corporation, and to a similar extent, is to be treated as a trust fund for the discharge of liabilities" to creditors.).  In their papers opposing summary judgment, Oren and the Relief Defendants have failed to show that the money they paid to Aragon consisted of anything other than equity contributions.  It follows that they are not entitled to any offset against the SEC's claim for disgorgement of the profits that Amir illegally earned in the Aragon account which were later distributed to them.[13]

---

[13]    Significantly, Oren and the Relief Defendants do not suggest that Rivka ever made any equity contribution to Aragon.  Accordingly, even if the Court were to accept the Relief Defendants' arguments regarding the effect of their contributions, Rivka would not be entitled to any setoff and could be required to disgorge the entire $500,000 that she received.

There also is no basis for the suggestion of Oren and the Relief Defendants that the SEC must trace the proceeds of Amir's illegal trading to their individual accounts. Rather, where tainted funds have been commingled with potentially legitimate funds, the SEC is entitled to obtain disgorgement from the entire pool of funds. Furthermore, to the extent that the proceeds of Amir's insider trading are no longer in the Aragon account, the SEC is entitled to pursue the return of an amount equal to the amount that Amir and Aragon illegally obtained. SEC v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000) (citing SEC v. Shapiro, 494 F.2d 1301 (2d Cir. 1974)).

As the District of Columbia Circuit noted in the Banner Fund case, to hold otherwise would lead to "absurd results" because a securities law violator could "spend all the proceeds of his fraudulent scheme while husbanding his other assets," thereby insulating himself from liability. Id. Indeed, in Shapiro, a defendant who traded unlawfully on the basis of insider information was required to disgorge all of his profits even though some of them had subsequently been lost through additional trades. See 494 F.2d at 1309.

The decision in Better Life, which Oren and the Relief Defendants seek to distinguish, is not to the contrary. That case arose out of a "Ponzi" or "pyramid" scheme which generated profits "through the sale of memberships and the attraction of new investors to the scheme." 995 F. Supp. at 171. Each membership in the club cost $39 per year. Members, in turn, were eligible to participate in "wealth building projects," the

largest of which was an "advertising pool," in which investors were falsely promised that they would double their investment in three months or less. Id. Although the sale of the memberships arguably was lawful, the advertising pool notes constituted investment contracts which were securities and therefore subject to registration under federal law. Id. at 173-74. By the time that the company ceased operations, it had collected $45 million in investments through the sale of its unregistered securities and had paid out $41 million to investors, but had only $2.7 million in its accounts, and faced more than $51.6 million in upcoming obligations to investors. Id. at 171-72. A special administrator also concluded that the company had received, at most, $117,894 from membership dues and other "legitimate" sources. Id. at 172 n.5, 179 n.20.

After the SEC requested disgorgement, the court undertook an analysis of the extent to which certain relief defendants had contributed to the acquisition of specific assets, observing that disgorgement would be required, except to the extent that the assets had been purchased using untainted funds. The only such untainted funds, however, were the membership fees. Id. at 180-84. The court also noted that there was "no question" that any tainted funds received by a gratuitous transferee would have to be disgorged. Id. at 181-82. In addition, the court held that "when legitimate assets are commingled with illegitimate ones, such that the assets cannot be separated out, a constructive trust may extend over the entire asset pool." Id. at 181.

40

Oren and the Relief Defendants suggest that <u>Better Life</u> supports their claim that factual issues exist here because the court in that case took care to "deduct" the amount of legitimate contributions from the amounts the relief defendants were required to disgorge, despite the commingling of legitimate and illegitimate contributions in a single account.  (R. Defs.' Mem. at 20 n.19 (citing <u>Better Life</u>, 995 F. Supp. at 179 n.20)). <u>Better Life</u> is distinguishable, however, from the facts of this case.  At the outset, the membership fees that the court deemed legitimate in <u>Better Life</u> did not constitute an investment.  Rather, they reflected payment for other products and services, such as a "subscription to the 'Better Life News,' [and] a one-third discount on seminars, guidebooks, and tapes."  <u>Better Life</u>, 995 F. Supp. at 171.  Here, by comparison, there is no question that Owen and the Relief Defendants – in particular Rivka – are gratuitous transferees who had no legal claim against the pooled funds held by Aragon prior to Amir's decision to make disbursements to them.  There consequently is no sum that they are entitled to "deduct" from any proceeds that they received from an account holding untainted funds.  Additionally, the corporate defendant in <u>Better Life</u> maintained "at least 27 bank accounts."  <u>Id.</u> at 173 n.6.  It therefore was possible that the funds that the relief defendants had received might not have come from tainted or commingled sources.  Here, on the other hand, the funds to which Oren and the Relief Defendants claim title unquestionably were commingled with the proceeds of illegality in a single account.

Accordingly, Oren and the Relief Defendants will each be required to disgorge $192,258 to the SEC, reflecting their proportional share of the proceeds of Amir's unlawful trading on behalf of Aragon.

C.    Prejudgment Interest

The Commission also seeks to recover prejudgment interest on any amounts disgorged calculated at the IRS underpayment rate. (Pl.'s Mem. at 26-27). In determining whether to order prejudgment interest, the Court must consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." First Jersey, 101 F.3d at 1476.

Oren and the Relief Defendants, having argued that they should not be required to disgorge any funds, do not address the interest rate that should apply to any monetary award. Zvi and Amir do not dispute the SEC's entitlement to some prejudgment interest if disgorgement is required, but maintain that interest should not be allowed for the period after they "offered to settle with the SEC" or with respect to any sums they did not personally receive. (Defs.' Mem. at 27). They further contend that any such award should be based on the lower rate set forth in 28 U.S.C. § 1961. (Id. at 30). That statute provides that the rate for post-judgment interest in a civil case shall be equal to "the weekly average 1-year constant maturity Treasury yield, as published by the Board

of Governors of the Federal Reserve System, for the calendar week preceding . . . the date

of the judgment."  28 U.S.C. § 1961.[14]

As the Second Circuit has noted, "[t]he decision whether to grant

prejudgment interest, and the rate used if such interest is granted, are matters confided to

the district court's broad discretion."  First Jersey, 101 F.3d at 1476.  Here, given the

nature of the statutory violations, the SEC is admittedly unlikely to be returning any

disgorged funds to the victims of the defendants' insider trading.  Accordingly, the

principal purpose to be served by an award of prejudgment interest is to deprive

individuals who have had the use of the proceeds of securities law violations of "what

amounts to an interest-free loan."  SEC v. Haligiannis, 470 F. Supp. 2d 373, 385

(S.D.N.Y. 2007).

Zvi and Amir argue that prejudgment interest should not run through the

date a judgment is entered against them because the SEC unreasonably refused to settle

with their "immediate family" for the sum of $3.5 million, insisting instead that the

settlement amount be $4.5 million and that the settlement be "global."  (See Amir Decl.

¶¶ 19-20 & Ex. 2) (letter from Paul Shechtman, Esq., to Nancy A. Brown, Esq., dated

Apr. 4, 2007.  In their view, the SEC insisted on the higher amount despite

"incontrovertible evidence" establishing that "most" of the SEC's claims in this suit are

---

[14]    That rate of course fluctuates; it recently has been below one percent.  (See Federal Reserve Statistical Release, http://federalreserve.gov/releases/h15/current/) (last visited Nov. 19, 2009).

"clearly erroneous." (Defs.' Mem. at 2). Worse yet, according to Amir, the SEC allegedly refused to meet with him so that he could explain "the many legal and factual errors in the complaint." (Amir Decl. ¶ 4). With no small degree of petulance, Zvi and Amir characterize the SEC's response to Amir's offer as a "knee jerk reaction" reflecting its "mindless insistence on pursuing all its claims without regard to their merits." (Defs.' Mem. at 2, 29).

       Suffice it to say, if judges were to determine prejudgment interest awards based on their views of the dates by which cases should have been settled, prejudgment interest might soon become a vestigial form of relief. Notwithstanding their hyperbole, however, Zvi and Amir simply have not shown that any of the SEC's conduct was unreasonable. Indeed, they have not even attempted to explain the bases on which either the SEC's demand or their offer was calculated. In any event, even if the Court were to assume that the SEC unduly protracted this litigation, the Second Circuit clearly has held that this would not provide a justification for the denial of prejudgment interest because the defendants had the use of their ill-gotten gains since they first were realized. See First Jersey, 101 F.3d at 1477; accord SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998).

       Blithely ignoring the fact that both they and their tippees were the beneficiaries of their unlawful acts, Zvi and Amir argue further that they should not be required to pay any interest on sums that they did not personally receive. (Defs.' Mem. at 28). However, a "tippee's gains are attributable to the tipper, regardless whether benefit

accrues to the tipper." Warde, 151 F.3d at 49.  Indeed, any other rule would enable a

tipper such as Zvi or Amir to circumvent financial liability through the simple expedient

of trading for the benefit of others, such as "their families, friends, and business

associates." Id.  That plainly is not the law.

Turning to the appropriate interest rate, as the Second Circuit noted in First

Jersey, "[w]hen the SEC itself orders disgorgement, . . . the interest rate it imposes is

generally the IRS underpayment rate."  101 F.3d at 1476.  In First Jersey, the court further

declared that the use of this rate was appropriate because it reflects the rate at which one

borrows from the government, unlike the Treasury bill rate, which reflects the rate at

which one lends money to the government.  Id.  Amir and Zvi criticize this observation,

contending that (1) the Second Circuit overlooked the fact that the IRS underpayment rate

is set three percentage points higher than the prevailing Federal Reserve short-term rates

to ensure that taxpayers do not seek to "borrow" money from the IRS through

underpayments, and (2) the use of the Section 1961 post-judgment rate "in a multitude of

legal contexts – including some SEC disgorgement actions – counsel[s] that it is generally

the best rate for prejudgment interest on disgorgement awards."  (Defs.' Mem. at 32)

(citing In re Int'l Admin. Servs., Inc., 408 F.3d 689, 710 (11th Cir. 2005) (affirming use

of one-year Treasury bond rate in bankruptcy court action to recover proceeds of

fraudulent transfers); SEC v. Cross Fin. Servs., Inc., 908 F. Supp. 718, 734 (C.D. Cal.

1995) ("Generally, unless the Court finds otherwise, the appropriate rate at which to

calculate prejudgment interest is the same rate as mandated by 28 U.S.C. § 1961 for post-judgment interest.")).

At least three factors augur in favor of using the IRS underpayment interest rate here.  First, that is the rate that the SEC itself employs when disgorgement is required as part of an SEC administrative proceeding.  First Jersey, 101 F.3d at 1476.  Second, the use of that rate has specifically been approved by the Second Circuit.  Id.  While the Court admittedly has the discretion to use another rate, the cases cited by Zvi and Amir are from other jurisdictions.  Zvi and Amir have not drawn the Court's attention to any securities fraud cases brought by the SEC in this Circuit in which prejudgment interest was awarded at a rate lower than the IRS underpayment rate.  Finally, although Judge Lynch did suggest in a case in this District involving a cargo loss that the federal post-judgment interest rate should be the "starting point for discussion," he expressly distinguished the facts of that case from First Jersey, noting that the defendants there "were guilty of fraudulent conduct."  Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 314 F. Supp. 2d 201, 204 (S.D.N.Y. 2003).  This, of course, is precisely the sort of conduct that Zvi and Amir have admitted engaging in through their trading in mid-2004.

Prejudgment interest in this case will therefore be calculated using the IRS underpayment rate.  See, e.g., SEC v. Castaldo, No. 08 Civ. 8397 (JSR), 2009 WL 2591376, at *2  (S.D.N.Y. Aug. 19, 2009) (awarding prejudgment interest at IRS rate and

interest from the date of decision in accordance with Section 1961(a)); <u>SEC v. Colonial Inv. Mgmt., LLC</u>, No. 07 Civ. 8849 (PKC), 2009 WL 3053745, at *34 (S.D.N.Y. July 7, 2009) ("Prejudgment interest shall be paid at the IRS underpayment rate."); <u>SEC v. DiBella</u>, No. 04cv1342, 2008 WL 6965807, at *5 (D. Conn. Mar. 13, 2008) (describing reliance on cases in which courts have reduced the prejudgment interest rate as "misplaced"); <u>see also</u> <u>SEC v. Universal Exp., Inc.</u>, No. 04 Civ. 2322 (GEL), 2009 WL 2486057, at *10 (S.D.N.Y. Aug. 14, 2009) (a case decided after <u>Old</u> <u>Dominion</u> in which Judge Lynch awarded prejudgment interest at the IRS rate pursuant to a consent agreement, but noted that even if no rate had been fixed, "the IRS underpayment rate would still apply").

     D.    <u>Civil Penalties</u>

     The securities laws provide two types of civil penalties potentially applicable to the illegal activities of Zvi, Amir, and Ayal.  First, under Section 21A of the Insider Trading and Securities Fraud Enforcement Act ("ITSFEA"), 15 U.S.C. § 78u-1(a)(1)-(2) ("Section 21A"), the Court may impose a fine "determined by the Court in light of the facts and circumstances, [which] shall not exceed three times the profit gained or loss avoided as a result of [the defendant's illegal activities]."  Second, under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) ("Section 21(d)(3)"):

> Whenever it shall appear to the Commission that any person has violated any provision of this chapter, the rules or regulations thereunder, or a cease-and-desist order entered by the Commission pursuant to section 78u-3 of this title, other

> than by committing a violation subject to a penalty pursuant to
> section 78u-1 of this title, the Commission may bring an
> action in a United States district court to seek, and the court
> shall have jurisdiction to impose, upon a proper showing, a
> civil penalty to be paid by the person who committed such
> violation.

15 U.S.C. § 78u(d)(3)(A).  Under Section 21(d)(3), there are three tiers of potential

penalties.  15 U.S.C. § (d)(3)(B)(i)-(iii).  The highest "third-tier" sanction calls for a

natural person to be fined the greater of $120,000 or the gross amount of pecuniary gain

that the defendant wrongfully obtained.  Id. § (B)(iii); 17 C.F.R. § 201.1002.  To impose a

civil penalty of this magnitude, the Court must find that the Exchange Act violation

"involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory

requirement" and "directly or indirectly resulted in substantial losses or created a

significant risk of substantial losses to other persons."  15 U.S.C. § 78u(d)(3)(B)(iii).

In this case, the SEC has asked the Court to impose civil penalties (1)

against Zvi and Amir in connection with their activities related to Taro's second-quarter

2004 earnings announcement, (2) against Amir in connection with Projects Victor and

AA, and (3) against Ayal in connection with Project Victor.  (Pl.'s Mem. at 27-32).  Zvi,

Amir, and Ayal do not appear to dispute the potential applicability of Section 21A on the

facts of this case.  They nevertheless assert that the present record is inadequate for the

Court to reach a fully-informed decision regarding the proper award, and therefore urge

that any decision be delayed until the SEC's remaining claims have been resolved, at

which point the Court can consider whether the SEC "needlessly delayed progress of the

case," thereby increasing the defendants' litigation costs. (Defs.' Mem. at 6-7). Amir and Ayal also contend that, as a matter of law, they cannot be required to pay third-tier penalties because Section 21(d)(3) is inapplicable to their conduct in connection with the PwC and E&Y trades. (Id. at 10-13).

Since the remedy of disgorgement merely restores a defendant to the status quo ante, the securities laws afford courts the discretion to impose a civil penalty "to accomplish the goal of punishment" and to deter future securities law violations. See Univ. Exp., Inc., 2009 WL 2486057, at *11; accord Colonial Inv. Mgmt., 2009 WL 3053745, at *34. In deciding whether to impose a penalty and, if so, the amount, "courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." Haligiannis, 470 F. Supp. 2d at 386 (citing SEC v. Coates, 137 F. Supp. 2d 413, 429 (S.D.N.Y. 2001)).

Turning first to the conduct of Zvi and Amir in connection with the second-quarter 2004 Taro trades, it is undisputed that Zvi's tip to Amir as well as Zvi's own insider trading generated total profits (or losses avoided) of $1,774,798, consisting of profits for Aragon in the amount of $962,906, for Noga in the amount of $214,946, for

Bahram in the amount of $243,288, for Heyman in the amount of $83,817, and for Zvi

himself in the amount of $269,841.[15]  Amir's illegal trading and tips ahead of the earnings

announcement accounted for all but $238,699 of this profit, i.e., a total of $1,536,099.

Even if one accepts Zvi's benign explanation for his disclosures to Amir in

2001 concerning CB Cream (a dubious proposition in light of Amir's guilty plea

allocution), the fact remains that Zvi traded and enabled others to trade in 2004 based on

material nonpublic information concerning Taro.  At the time that he did so, Zvi was an

officer of Taro and was fully aware that the company had a policy that precluded such

trading as well as the disclosure of Taro's nonpublic information.  (Ex. 21 (Zvi Dep.) at

96-98; Compl. ¶¶ 27-28; Ex. 2 ¶¶ 11-12).  Despite that knowledge, Zvi set in motion a

chain of events that resulted in profits (or loss avoidance) totaling nearly $2 million.  To

make matters worse, this insider trading was not Zvi's first brush with the law.  In 2000,

Zvi entered a plea of guilty to one count of making false claims, in violation of 18 U.S.C.

§ 287, in connection with his prior employment by a military contractor.[16]  (Pl.'s 56.1

Stmt. ¶ 82).

Although Zvi was the corporate insider, Amir's admitted misconduct was

no less egregious.  Indeed, by 2004, Amir was a recent law school graduate who had

---

[15]    Zvi's sale of ten thousand shares of Taro stock generated proceeds of $438,099.
By selling ahead of the disappointing earnings announcement, Zvi avoided losses in the amount
of $238,699 (Pl.'s 56.1 Stmt. ¶¶ 41, 44).

[16]    Judge Raggi of the Eastern District of New York sentenced Zvi to six months of
home confinement, to be followed by three years of probation.  (Ex. 30).

taken courses in securities regulation and business crime, and who had been trading securities since 1999. (Amir Dep. 40, 51, 105, 119). He therefore clearly understood that his actions in connection with Taro's second-quarter 2004 earnings announcement violated the federal securities laws. Moreover, by his own admission, Amir was involved in multiple insider trading violations – both as a tipper and as a tippee – over a period of years. (See, e.g., Ex. 6 at 21; Compl. ¶¶ 157-58; Ex. 3 (Amir Ans.) ¶ 54). He in fact could be viewed as the prime mover in the insider trading scheme giving rise to the criminal charges and the SEC's civil complaint.

Zvi and Amir argue that the Court nevertheless should forego the imposition of civil penalties under Section 21A because of the "devastating effects this litigation and the criminal case . . . have had on them." (Defs.' Mem. at 25). They note that, "[i]nstead of being a successful attorney, Amir's prospects of ever working in the legal profession are very weak," and that there is even less of a chance that Zvi will be able to secure well-paid employment upon his release. (Id.). They further observe that they both are subject to three years of supervised release, that Amir must complete three hundred hours of community service, and that Zvi was fined $100,000 and Amir was fined $75,000 in the criminal case. (Id. at 25). They also ask the Court to "take into account the immeasurable emotional and psychological pain that [they], as well as the rest of the Rosenthal family, have endured because of this action and the parallel criminal case. (Id. at 26). Finally, they note that the disgorgement judgment they face "may very

well be in excess of [Amir's] assets" and will impose liability on Zvi for trades that he did

not make and from which he allegedly did not directly benefit.  (Id.).

        Ironically, in the criminal case, counsel for Zvi and Amir argued that

restitution should not be required because both disgorgement and civil penalties would be

imposed in this case.  (See Exs. 7 at 11 (predicting that Amir would be "wiped out"

because this Court would require disgorgement of his "ill-gotten gains" and take

"legitimately earned income"), 8 at 6 (remarks of Zvi's attorney) ("In addition to

disgorgement, the[re will] be a penalty of the amount of disgorgement.  So it's like one

plus one.")).  The fact that they were fined is also of limited consequence because Amir

evidently paid only a small fraction of his fine prior to the filing of the SEC's motion, and

Zvi paid his fine using $80,000 loaned to him by Efrat from an account in her name into

which Amir had transferred $500,000 of Aragon's funds.  (See Brown Decl. II, Exs. C,

D).

        In these circumstances, the imposition of civil penalties under Section 21A

clearly is warranted.  The Commission seeks the full measure of relief available under

that statute, which is three times the illegal profits that Zvi and Amir obtained.  In my

judgment, a civil penalty equal to two times the illegal profits arising out of the second-

quarter 2004 Taro trading is more than sufficient to accomplish the statute's purpose.

Accordingly, the penalty imposed upon Zvi and Amir under Section 21A will be limited

to that amount.

The Commission also seeks third-tier civil penalties under Section 21(d)(3) with respect to the trading arising out of Projects AA and Victor. (See Pl.'s Mem. at 30-33). Amir and Ayal maintain that the Court lacks the authority to impose such penalties because this is an insider trading case. They advance two reasons why this allegedly is so. First, they note that Section 21A permits the Court to impose a penalty of up to three times the profits gained or losses avoided in an insider trading case. (Defs.' Mem. at 10-11). Here, because Amir and Ayal neither made a profit nor sustained a loss, the parties agree that Section 21A does not allow the Court to impose a civil penalty against Amir or Ayal in connection with their Project AA and Project Victor trading.

Nevertheless, because a civil penalty could have been imposed under Section 21A had the trading related to Projects AA and Victor resulted in a profit, Zvi and Amir argue that Section 21(d)(3) cannot be utilized because it applies, by its terms, only to a person who has violated the Exchange Act "other than by committing a violation subject to a penalty pursuant to Section 21A."[17] (Id. at 11) (emphasis added). In other words, Amir and Ayal dispute the SEC's contention that the "subject to" language means that a penalty must actually have been imposed for relief under Section 21(d)(3) to be unavailable. (See Pl.'s Mem. at 30: Defs.' Mem. at 10-11). In their view, the mere possibility that someone trading on inside information could have been penalized under Section 21A means that Section 21(d)(3) is inapplicable. (Defs.' Mem. at 11) Amir and

---

[17]    The exception for a violation "subject to" a penalty pursuant to [Section 21A] also appears in Section 22(a) of the Securities Act, 15 U.S.C. § 77t(d)(1).

Ayal also maintain that the second element necessary to impose a third-tier penalty – proof that the violation "directly or indirectly resulted in substantial losses" or created a significant risk of "substantial losses to other persons" – cannot be met in insider trading cases.  (Id. at 11-12).

      Neither the SEC nor Amir and Ayal have cited any cases specifically addressing the applicability of Section 21(d)(3) to insider trading cases.  Amir and Ayal have, however, called to the Court's attention a report of a House of Representatives committee which suggests that Congress may have intended to exclude insider trading cases from the ambit of Section 21(d)(3).  See H.R. Rep. No. 101-66, at 16-17 (1990) ("H. Rep."), as reprinted in 1990 U.S.C.C.A.N. 1379, 1383-84.  In that report, the committee stated:

> The Insider Trading Sanctions Act of 1984 gave the Commission the authority [under Section 21A] to seek civil penalties against those who have engaged in insider trading offenses. . . . The Committee believes that the money penalties proposed in this legislation are needed to provide financial disincentives to securities law violations other than insider trading.

Id. (emphasis added).

      In its reply papers, the SEC urges the Court not to read the language in Section 21(d)(3) carving out an exception for "a violation subject to a penalty pursuant to [Section 21A]" restrictively because its meaning allegedly is unambiguous and because the Exchange Act should be read broadly to further its remedial purposes.  (Pl.'s Reply

Mem. I at 7-8).  For the same reasons, the SEC also urges the Court not to resort to the

legislative history of Section 21(d)(3) as an aid to understanding its meaning.  (Id. at 7

n.8).

   It is a "familiar canon of statutory construction that remedial legislation

should be broadly construed to effectuate its purposes."  Tcherepnin v. Knight, 389 U.S.

332, 336 (1967).  Furthermore, the Exchange Act "quite clear falls into the category of

remedial legislation."  Id.  Giving Section 21(d)(3) the broad construction that the case

law requires, it is reasonable to read the language authorizing the imposition of one of

three tiers of penalties for violations other than those "subject to a penalty pursuant to

Section 78u-1" to mean that a penalty is authorized under Section 21(d)(3) unless a

penalty has actually been imposed pursuant to Section 21A.  Indeed, any other

interpretation would mean that an insider trader who lost money could not be subjected to

any civil penalty.  As the Commission indicates, this would be inconsistent with the broad

remedial goals of the securities laws.

   In any event, even if the Court were to resort to the legislative history, it is

by no means certain that a restrictive reading of the statute would be warranted.  Prior to

the passage of ITSFEA in 1990, Section 21A of the Exchange Act authorized the

Commission to seek a civil penalty against a person who engaged in insider trading or a

person who controlled the insider trader.  In the House Report that Amir and Ayal cite,

Congress noted that, in marked contrast to the limited authority granted to the

Commission, virtually every other federal regulatory agency – including the Commodity Futures Trading Commission, the Federal Deposit Insurance Corporation, and the Federal Reserve System – has broad "statutory authority to seek or impose civil money penalties." See H. Rep., 1990 U.S.C.C.A.N. at 1382.  Recognizing the value of such civil penalties, the House Committee on Energy and Commerce concluded that the SEC needed the "additional authority contained in [the proposed legislation] to attack the full range of fraudulent activity in the securities markets." Id. at 1834 (emphasis added).  As the Committee observed, "[b]y authorizing money penalties for violations of the securities laws other than insider trading, this legislation would greatly increase deterrence, while also providing both the Commission and the courts with the flexibility to tailor a remedy to the gravity of the violation." Id.

Thus, even the legislative history of Section 21(d)(3) can be read to suggest that the intent of Congress was to provide additional, rather than merely alternative, civil penalties for violators of the securities laws.  As noted above, were it otherwise, persons trading on inside information who made a profit would be subject to sanctions, as would any other securities violators regardless of the financial consequences of their actions, but persons trading on inside information who neither made a profit nor avoided a loss would be exempt from civil penalties.  There is no reason to believe that Congress intended to create such a statutory lacuna which is inconsistent with the goal of deterrence.

Accordingly, I conclude that Amir and Ayal are subject to civil penalties under Section 21(d)(3). As noted above, to obtain the third-tier penalties that it seeks, the Commission must show that a defendant's securities violations "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." There is no doubt that the first of these prongs has been met. Indeed, Amir conceded during his guilty plea that he gave Heyman material nonpublic information about Taro and later received in return material nonpublic information about Project AA. (See Pl.'s 56.1 Stmt. ¶ 23). Amir also admits that he engaged in unlawful securities trades based on Heyman's tip. (Id. ¶ 74). This conduct also was not an aberration, but, rather, was part of a multifaceted insider trading scheme.

Ayal similarly concedes that he not only tipped Amir about Project Victor when he first learned of it, but also when it became clear that the proposed transaction would not take place. (Id. ¶¶ 61-62, 66-67). In doing so, Ayal twice disclosed confidential information in derogation of his fiduciary duty to PwC by whom he was employed. Ayal further concedes that his conduct was, at a minimum, reckless. (Id. ¶ 69).

Turning to the second showing required for the imposition of third-tier penalties, Amir and Ayal contend that the SEC "in typical conclusory manner" has alleged that the trading generated by Heyman's and Ayal's tips created a "significant risk

of substantial losses to others." (Defs.' Mem. at 12 (quoting Pl.'s Mem. at 31)). They

further maintain that the SEC's assertion "ignores the realities of the securities markets

and overstates the theories upon which insider trading is based." (Id.). The defendants

offer to brief these issues in further detail if granted more time. (Id.).

The issue under Section 21(d)(3) is not whether a counterparty actually

sustained a loss, but whether the defendants' sales of put options "created a significant

risk of substantial losses to others." In that regard, it is undisputed that after both

Heyman's tip and Ayal's initial tip, Amir sold the target company's put options. (See

D'Avino Decl. Ex. 2). Amir therefore entered into the trades on the assumption that the

price of the target company's stock would rise. See Marcia Stigum, The Money Market,

826-30 (3d ed. 1990). Conversely, the purchasers of the put options that Amir sold

gambled that the stock prices would fall. Id. Assuming that both of the mergers that

were leaked to Amir had come to fruition and that the target company's stock price

therefore would have increased, the purchasers of the puts presumably would not have

exercised their option to require Amir to sell them the target companies' shares at the

strike price. The option purchasers' losses consequently would have been the cost of the

options, which in this instance appears to have been approximately $50,000 in connection

with Project Victor and $70,000 in connection with Project AA. (D'Avino Decl. Ex. 2).

The option purchasers presumably would not have purchased the put options, however,

had they had access to the nonpublic information that Amir possessed with respect to the

proposed mergers. While the losses that the purchasers sustained are admittedly not enormous, they certainly were substantial enough to satisfy Section 21(d)(3). Indeed, the size of the purchasers' losses was limited only by Amir's apparent unwillingness to place larger bets on the target companies' stock prices based on the information improperly leaked to him.

In light of Amir's repeated securities violations, it plainly is appropriate to impose the maximum third-tier penalty on him. Under Section 21(d)(3), as adjusted for inflation by 17 C.F.R. § 201.1002, the maximum penalty for a natural person per violation is the greater of the pecuniary gain or $120,000. Accordingly, having traded on two illegal tips from Ayal and one from Heyman, and having twice illegally tipped his law firm supervisor, Amir is responsible for five separate securities law violations and will be required to pay a civil penalty of $600,000.

Ayal tipped Amir twice: first when he learned of the proposed Project Victor merger and later when he learned it was canceled. Ayal consequently faces a maximum civil penalty of $240,000. Nevertheless, because his conduct relates to a single proposed transaction and is substantially less egregious than that of Amir, the Court will limit Amir's civil penalty to $120,000.[18]

---

[18]    I note that this same penalty could have been imposed if the Court decided to impose only a second-tier penalty, which requires no showing that any person actually suffered, or faced a significant risk of, substantial loss. 15 U.S.C.A. § 78u(d)(3)(B)(ii).

E.    Officer Bar

The final form of relief sought by the SEC is an order permanently barring Zvi from serving as an officer or director of any public company.  Pursuant to 15 U.S.C. §§ 77t(e) and 78u(d)(2), a court may "prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated [Section 10(b) of the Exchange Act or Section 17(a) of the Securities Act] from acting as an officer or director . . . if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer."

A district court has "substantial discretion" in deciding whether to impose a director/officer bar.  SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995).  The factors that the court should consider in exercising this discretion are essentially the same as those applicable in deciding whether to require disgorgement.  See id. at 142 (adding as a consideration the "likelihood that misconduct will recur").  In his papers, Zvi does not oppose a lifetime bar, nor could he seriously attempt to do so in light of his prior criminal conviction and his pivotal role in the insider trading scheme.  The Court therefore will direct that Zvi be barred for life from serving as an officer or director of any publicly-traded company.

V.    Applicability of Rule 54(b)

The Commission further requests that final judgment be entered with respect to the claims on which it has been awarded partial summary judgment.  Rule 54(b)

60

of the Federal Rules of Civil Procedure provides in that regard that a court may enter final

judgment with respect to fewer than all of the claims or parties in a case involving

multiple claims or parties "only if the court expressly determines that there is no just

reason for delay." Fed. R. Civ. P. 54(b). Thus, for the Court to enter a partial final

judgment

> (1) [M]ultiple claims or multiple parties must be present, (2)
> at least one claim, or the rights and liabilities of at least one
> party, must be finally decided within the meaning of 28
> U.S.C. § 1291, and (3) the district court must make "an
> express determination that there is no just reason for delay"
> and expressly direct the clerk to enter judgment.

Info. Res., Inc. v. Dun & Bradstreet, 294 F.3d 447, 451 (2d Cir. 2002) (quoting Ginett v.

Computer Task Group, Inc., 962 F.2d 1085, 1091 (2d Cir. 1992)); accord Grand River

Enters. Six Nations v. Pryor, 425 F.3d 158, 164-65 (2d Cir. 2005).

Here, all three requirements clearly are met. First, the SEC has asserted

multiple claims and named multiple parties in its Amended Complaint. Second, the Court

has finally determined the claims against all Defendants arising out of the second-quarter

2004 trades and the Project Victor trades. The Court also has finally determined the

claims against Amir arising out of the trades related to the CB Cream announcement.

The key inquiry relates to the third requirement, which is that there be no

just reason for delay. See Fed. R. Civ. P. 54(b). This determination is left to the Court's

discretion. Ginett, 962 F.2d at 1092. A court thus can certify claims pursuant to Rule

54(b) provided that they are not "inherently inseparable from" or "inextricably interrelated to" other claims remaining in the suit. Id. at 1096. To facilitate appellate review, the Court of Appeals has suggested that a district court provide a "brief reasoned statement in support of its determination that 'there is no just reason for delay' * * * where the justification for the certificate is not apparent." Id. at 1092 (quoting Gumer v. Shearson Hammill & Co., 516 F.2d 283, 286 (2d Cir. 1974).

In this case, the claims arising out of the July 2004 Taro earnings announcement and Project Victor have been fully resolved against the only remaining defendants by virtue of the Court's decision to grant partial summary judgment. Additionally, although the claims against Zvi arising out of the CB Cream announcement remain in the case, Zvi does not dispute that he conveyed material nonpublic information to Amir which Amir then used to execute trades. Indeed, the only issues left unresolved by this Memorandum Decision and Order are whether Zvi acted with the requisite intent in disclosing information to Amir in 2001 and whether Zvi and Amir are liable for the disgorgement amount that Heyman failed to pay because of his financial situation. However, if the Court of Appeals reviews the claims as to which partial summary judgment has been granted, its decision will not affect any as-yet undecided claims in this case, nor is there any possibility that further proceedings in this Court would moot any decision that the Court of Appeals might enter.

Of equal importance, throughout these proceedings, the Commission has been extremely concerned about the collectability of any judgment that may be entered. There is ample reason for this concern since the Defendants have done their utmost to delay the entry of a money judgment against them. As the Commission accurately observes, unless a final judgment is certified, there is a risk that the Defendants will be able to continue dissipating their assets, thereby reducing the likelihood that the full amount of the judgment will be satisfied.

For these reasons, the judgment giving force to the Court's rulings will certify as final each of the aforementioned claims as to which partial summary judgment has been granted.

VI.    Conclusion

For the foregoing reasons, the Commission's motion for partial summary judgment (Docket No. 129) is granted in part and denied in part. The Commission is further directed to settle a proposed final judgment consistent with this Memorandum Decision and Order, on notice to the Defendants, within ten days.

Additionally, because Zvi and Amir remain incarcerated, it has been difficult to schedule pretrial conferences. The Commission and the Defendants are

therefore requested to submit letters to the Court within ten days describing any discovery

that remains outstanding and suggesting what the next steps in this case should be.

SO ORDERED.

Dated:          New York, New York
                November 24, 2009

_____
FRANK MAAS
United States Magistrate Judge

Copies to:

Nancy A. Brown, Esq.
Securities and Exchange Commission
Fax:  (212) 336-1322

Robert Knuts, Esq./Sarah Havens
Allen & Overy, LLP
Fax:  (212) 610-6399

Amir Rosenthal
No. 74936-053
FCI Otisville
P.O. Box 1000
Otisville, New York 10963

Ayal Rosenthal
P.O. Box 16268
Tel Aviv-Yafo 61162
Israel

Zvi Rosenthal
No. 54076-053
FCI Otisville
P.O. Box 1000
Otisville, New York 10963

64